331 So.2d 192 (1976)
Randle BUTLER, Individually and as Tutor of his minor daughter, Elizabeth, Plaintiff-Appellee,
v.
The LOUISIANA STATE BOARD OF EDUCATION, and University of Southwestern Louisiana, Defendants-Appellants.
No. 5392.
Court of Appeal of Louisiana, Third Circuit.
April 14, 1976.
Rehearing Denied May 19, 1976.
Writ Refused July 1, 1976.
William J. Guste, Jr., Atty. Gen., Baton Rouge, and Frank P. Trosclair, Jr., Opelousas, for defendants-appellants.
John K. Hill, Jr., Mouton, Roy, Carmouche & Hailey, Lafayette, Roberts & *193 DeSonier, by John T. Keys, Jr., Metairie, for plaintiff-appellee.
Before HOOD, GUIDRY and PETERS, JJ.
HOOD, Judge.
Randle Butler instituted this suit individually and as tutor for his minor daughter, Elizabeth Butler, to recover damages for injuries sustained by his daughter when she fainted and fell after giving blood for a biology experiment. The defendants are the Louisiana State Board of Education and the University of Southwestern Louisiana. Miss Butler reached the age of majority after the suit was instituted, and thereafter the suit was continued with her and her father as plaintiffs. The trial court rendered judgment in favor of plaintiffs. Defendants appealed.
The principal issue presented is whether Df. W. D. Durio who was an assistant professor of biology at the above university when the accident occurred, was negligent in failing to provide proper facilities or supervision for the withdrawing of blood from Miss Butler, with the result that defendants are liable for the injuries sustained by plaintiffs.
In September, 1968, Miss Butler, who was then 18 years of age, enrolled as a freshman at the University of Southwestern Louisiana. Paul Villien, who was 20 years of age, enrolled as a senior in pre-medical studies at the same university at that time.
During the fall semester of 1968, the university offered for credit a course designated as "Biology 410," which was an individual study course for advanced students. Each student who took that course was permitted to engage in a research project under the supervision of a member of the faculty in the Biology Department, and by doing so he could earn credits to apply toward obtaining his degree.
Villien enrolled in the "Biology 410" course that semester, and he desired to undertake a research project which involved comparing the Vitamin C content in the blood of smokers with the Vitamin C content in the blood of non-smokers. Since a project of that kind required faculty supervision, Villien approached Dr. Walter Durio, an Assistant Professor of Biology, and discussed the project with him. Dr. Durio agreed to permit Villen to undertake the research project under his supervision and direction.
The project required the extraction of blood from student volunteers, some of whom were to be smokers and some non-smokers. The student volunteers would be required to give 5 cc's of blood, amounting to approximately one tablespoon, on each of several occasions which were to be scheduled by Villien. After drawing and analyzing the blood samples, Villien then planned to write a report based on a comparison of the non-smokers' control group with the smokers' control group.
The drawing of blood was to be performed by the student, Villien, who had acquired a working knowledge of blood extraction as the result of his part-time employment at Lafayette Charity Hospital. Prior to the accident, which occurred on October 17, 1968, Villien had been employed as a laboratory assistant in that hospital for about two years. He usually worked two or three nights per week and on weekends during the school year, and he worked full time during the summer vacation. He was given no specific clinical training in the drawing of blood during the above part-time employment, but he received on-the-job training under the direction of the medical technicians employed by the hospital. Villien was instructed in the various procedures of drawing blood, and in the procedures and practices of dealing with patients who became faint or weak subsequent to the extraction of blood. During the period of his employment prior to the accident, Villien dealt with approximately five persons who had become faint or syncopic following the extraction of blood. All *194 of those persons responded favorably to the first aid techniques he had been taught, however, and no accidents had occurred.
Dr. Durio permitted Villien to use his office, Room 200C of Billeaud Hall, for the purpose of extracting blood from the student volunteers. His office was a small room, being ten feet by twelve feet in size. In that office were an average size desk, a bookcase, several chairs and a small end table. There was no wheelchair or rollaway bed in that office. There also was no cot or bed or long table suitable for a person to lie on in Dr. Durio's office. There, however, was a long conference table suitable for that purpose in a conference room located adjacent to Dr. Durio's office. Dr. Durio and his secretary apparently agree that the distance from the desk in Durio's office to the above conference table, was about 16 paces.
To obtain volunteers for the above project, Villien asked his friends and other students to participate. Dr. Durio also endeavored to obtain student volunteers for the project by announcing to his classes, including the class in which Miss Butler was enrolled, the purpose of the project and then asking his students to participate in it. It was in response to one of Dr. Durio's announcements that plaintiff, Elizabeth Butler, volunteered to give blood for Villien's project.
On October 17, 1968, Miss Butler went to Dr. Durio's office, accompanied by her dormitory suitemate, Linda Fowler. Upon her arrival at Room 200C of Billeaud Hall, she entered the secretarial outer office, staffed by Mrs. Pat Dakin, a secretary in the Biology Department. Mrs. Dakin greeted Miss Butler, determined the purpose of her visit and instructed her to have a seat in the outer office, since Villien at that time was extracting blood from another volunteer. Mrs. Dakin testified that Miss Butler appeared apprehensive and nervous, and that she overheard plaintiff say something which indicated that she thought the blood was to be extracted from her finger instead of from her arm.
Shortly thereafter, when Miss Butler entered Dr. Durio's office, she was greeted by Villien, who informed her that the blood was to be extracted from her arm. He detected that she was uneasy, and he tried to reassure her by joking with her. Miss Butler was seated in a chair next to the desk in Dr. Durio's office. Villien placed a tourniquet on her arm, sterilized the area in which the needle was to be inserted, and he then attempted to puncture the vein with a vacutainer, a tube with needle attached and containing a vacuum. After several unsuccessful attempts to find the vein, Villien finally succeeded in withdrawing the required 5 cc's of blood from Miss Butler. After the extraction, Villien showed the tube of blood to Miss Butler, whereupon she expressed a feeling of being weak or faint. Villien immediately tried to reassure her, and while doing so he secured a coke from which Mrs. Butler took a couple of swallows. The testimony is conflicting as to whether Miss Butler at that time was administered some ammonia, and as to whether she was instructed to put her head in her lap or in a dependent position. It was evident, however, that regardless of what was done her condition did not improve.
Villien was aware of the fact that Miss Butler's condition had not stabilized, and he decided that the correct procedure would be for her to lie down, that being the recognized treatment for syncopy or fainting. The only available place for Miss Butler to recline, other than on the floor, was on the above mentioned conference table which was located in the conference room adjacent to Dr. Durio's office.
Miss Butler, with Villien and Linda Fowler walking beside her, then proceeded to walk from Dr. Durios office toward the conference room in which the above table was located. The evidence shows that Villien and Miss Fowler each had one hand *195 on Miss Butler's back, but that they were not supporting her while she walked. When they reached a point near the door of the conference room, and within six feet of the conference table, Miss Butler suddenly fainted and fell forward to the floor. Her chin struck the floor, and as a result of that fall, six of her teeth were broken or badly damaged.
After Miss Butler fell, ammonia was administered to her. She was picked up by Villien and put on the conference table, and she was allowed to recline on that table until her syncopic episode had passed. She then was taken by Mrs. Pat Dakin to Lafayette General Hospital, accompanied by Linda Fowler, where she was treated and released. Upon leaving the hospital she was taken to a dentist for treatment.
This suit was filed on October 14, 1969, but was not tried until June 19, 1974, almost six years after the accident occurred. The trial court concluded that Dr. Durio was negligent in having allowed Villien to conduct the above experiment, involving the withdrawal of blood from students, "without properly supervising and preparing for just such an occurrence as did in fact happen here to Miss Butler." He found that Dr. Durio also was negligent in having failed to instruct Villien to prepare for "a syncopic subject after extraction of blood." Judgment was rendered by the trial court in favor of plaintiff and against defendants, in solido, awarding Miss Butler $8,772.00, and her father $886.00. Defendants have appealed. Plaintiffs have not appealed or answered defendants' appeal.
We have concluded that there is no error in the judgment rendered by the trial court.
During the interval which elapsed between the date of the accident and the date of the trial, paul Villien enrolled in and completed medical school. He was licensed to practice medicine at the time of the trial, and at the trial he was qualified to testify as an expert as to the standards which prevailed among medical experts in that community for withdrawing blood from patients. He stated that in his opinion the facilities which existed in Billeaud Hall where the blood was being extracted were adequate or standard for the medical profession in that community. He also testified, however, that in order to determine whether a person has recovered from a pre-syncopic episode sufficiently to enable him to walk, the monitoring of that person's vital signs is required, such as heart beat, respiration and pulse, and that he did not know how to make that determination when the accident occurred in 1968. He stated that most of the patients he withdrew blood from while working at the Charity Hospital were in a reclining position when the withdrawal was made, and he dosen't remember whether the five persons who experienced pre-syncopic symptoms while he was extracting blood were reclining. Nurses were on duty 24 hours a day there, however, and doctors were on call immediately. Dr. Villien also stated that when a patient becomes progressively syncopic he "is usually either carried or rolled in a wheelchair to an appropriate place," or he should be "seated or put down on the floor." When asked whether he feels that he followed accepted procedures in handling Miss Butler, he stated that he did, but he qualified that answer by stating that he followed accepted procedures "for a layman."
Dr. Villien testified that Dr. Durio did not discuss with him or give him any instructions about monitoring vital signs of a pre-syncopic patient before permitting him to walk. He stated that he discussed generally with Dr. Durio the experience which Villien had had in extracting blood, but he said, "I don't recall whether or not we discussed what to do with the syncopic patients." He also testified, "It would have been better if we would have had a wheelchair. . . it would have been a matter of transporting the patient to a bed or table."
*196 Dr. Durio held doctorates in Physiology and Biology. He was not a medical doctor, but he had received formal training in the withdrawal of blood from human beings, and he had actually withdrawn blood from 20 to 25 persons. None of those persons experienced pre-syncopic episodes, however, so Dr. Durio has had no first hand experience in treating patients under those conditions. Dr. Durio testified that before the accident occurred he did not inform Villien that a patient should lie down if he became faint. He explained that he did not anticipate that Villien would encounter a problem such as Miss Butler's pre-syncopic episode, that it would have been "virtually impossible" for him to have a bed or table any closer to his office than was the conference table, and that he did not tell Villien that a pre-syncopic patient should not be allowed to walk, or that the patient should be supported in the event it became necessary for him to walk. Dr. Durio stated that in view of Villien's experience at the Charity Hospital he pretty much relied on the latter's judgment in handling patients who became faint after the extraction of blood. He did not discuss the use of smelling salts with Villien, and there in fact were no smelling salts in Durio's office.
Dr. J. Boring Montgomery, who is engaged in the general practice of medicine, testified that a cot or table need not necessarily be in the same room when the blood is extracted, but that most laboratories and most physician's offices have such a facility very near or "readily available" for the patient. We understand his views to be that a distance of "three or four paces" would be close enough to meet the medical standards of that community, but that it would be "pushing your luck" to have the bed or table located as much as ten paces from the place where the blood is extracted. Dr. Durio and his secretary agree that the conference table was about 16 paces from the place where Miss Butler was seated when the blood was extracted.
An important legal question presented is whether Dr. Durio owed to the students who volunteered to give blood for this project, including Miss Butler, the same duty of care as would have been required of members of the medical profession in that community.
The law is settled that nurses and medical technicians who undertake to perform medical services are subject to the same rules relating to the duty of care and to liability as are physicians in the performance of professional services. Favalora v. Aetna Casualty & Surety Company, 144 So.2d 544 (La.App. 1 Cir. 1962); Norton v. Argonaut Insurance Co., 144 So.2d 249 (La.App. 1 Cir. 1962); Thompson v. plies to a professor of Biology in a univer Brent, 245 So.2d 751 (La.App. 4 Cir. 1971). We believe that the same rule apsity, who approves and undertakes to supervise a project which includes the performance of a medical function, such as the withdrawal of blood from volunteer students. If he allows a student to perform that medical function, then we think he owes a duty to the volunteer patient or blood donor to see that the same precautions are taken for the safety and well being of that patient as would be taken by licensed medical doctors in that locality.
The applicable rule, as stated in Meyer v. St. Paul-Mercury Indemnity Co., 225 La. 618, 73 So.2d 781 (1953), is:
"A physician, surgeon or dentist, according to the jurisprudence of this court and of the Louisiana Courts of Appeal, is not required to exercise the highest degree of skill and care possible. As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case."
*197 In the instant suit we agree with the trial judge that Dr. Durio was negligent in at least the following respects: (1) In allowing this experiment to be conducted without previously instructing or preparing Villien, the 20-year old student who was to extract blood from other students, so that he could properly care for patients who had pre-syncopic or syncopic episodes following the extraction of blood, and (2) in authorizing one of his students to extract blood from volunteers without providing a bed or table nearer the place where the blood was being extracted, or without arranging for a wheelchair or a rolling bed to be available immediately so that a pre-syncopic patient could be carried or transported safely to a place where he could recline.
We believe that the degree of care exercised by Dr. Durio fell short of that required of members of the medical profession, under similar circumstances, in that locality. If Durio had properly instructed Villien as to the procedures which should be followed when a patient develops presyncopic symptoms, and had he also provided ready access to a bed or table or a means of carrying the patient to such a facility, the accident probably would not have occurred. His negligence in failing to give the above instructions and in failing to provide the needed facilities was a proximate cause of the accident. Dr. Durio's negligence must be attributed to the defendant university and to the State Board of Education.
Defendants contend, however, that plaintiffs are barred from recovering by contributory negligence on the part of Miss Butler. They argue that plaintiff insisted that she wanted to go back to her dormitory, and that she misled Villien by telling him that she was feeling fine after the blood was extracted, when she in fact was feeling faint.
Miss Butler and a classmate who was with her deny that plaintiff insisted upon returning to her dormitory or that she told Villien that she was feeling alright. On the contrary, they testified that from the time the blood was extracted until the accident occurred, Miss Butler insisted that she felt weak and faint and that she wanted to lie down. Villien acknowledges that he was not misled by anything Miss Butler may have said. He knew that she was having a severe pre-syncopic episode, that she could not have walked to her dormitory or even down the stairs of Billeaud Hall, and that it was necessary for her to lie down. He apparently did not know that it was dangerous to allow a person under those conditions to attempt to walk and particularly to attempt to do so without adequate support to prevent the patient from falling in the event he or she suddenly loses consciousness. He was walking with her to the conference table so that she could lie down when the accident occurred, but he did not provide adequate support for her to prevent her from falling. We think his failure to take that precaution was due to a lack of knowledge of the danger involved, the failure of his supervisor to adequately instruct him, and the lack of facilities which would have enabled him to move Miss Butler to the conference room without subjecting her to the danger of attempting to walk.
We agree with the trial court that defendants have failed to establish contributory negligence on the part of Miss Butler. We conclude that there is no error in the judgment appealed from.
For the reasons assigned, the judgment appealed from is affirmed. The defendants-appellants are condemned to pay only those costs which they legally are obligated to pay.
AFFIRMED.