378 So.2d 383 (1979)
Bobby Ray HARRIS et al.
v.
STATE of Louisiana Through HUEY P. LONG MEMORIAL HOSPITAL and State Department of Hospitals et al.
No. 64957.
Supreme Court of Louisiana.
December 13, 1979.
Donald E. Puckett, La. Dept. of Health & Human Resources, Baton Rouge, for defendants-respondents.
LeDoux R. Provosty, Jr., Provosty, Sadler & deLaunay, Alexandria, for third party defendants-respondents, St. Paul Fire & Marine Ins. Co. and Dr. T. E. Banks.
John T. Bennett, Riddle & Bennett, Floyd J. Falcon, Jr., Avant, Wall, Thomas, Riche *384 & Falcon, Baton Rouge, for plaintiffs-applicants.
BLANCHE, Justice.[*]
Plaintiffs, the four children of Mrs. Lula B. Harris, seek damages in the amount of $322,863.88 from the State of Louisiana for the illness and pain suffered by their mother and for the loss to themselves caused by her death, all of which they claim was caused by the fault of the State employees at the Huey P. Long Memorial Hospital in Pineville, Louisiana.
This is one of two consolidated cases, in the other of which Dr. T. E. Banks, a physician at Rapides General Hospital, and his insurer were defendants; from that appeal no writ was sought, and the decision in that case is therefore final.
Both the Ninth Judicial District Court and the Court of Appeal for the Third Circuit found that there was proper medical care given to Mrs. Harris; that the doctors and hospital personnel at Huey P. Long Memorial Hospital were not negligent in the performance of their jobs; that the diagnosis and treatment Mrs. Harris received were proper; that the standard of care she received was no breach of the standard in the community; and that plaintiffs had failed to carry their burden of proving fault or neglect for which the state would be answerable. Plaintiffs applied for writs which were granted.
We now review the evidence as did both lower courts.
At the time the events in question occurred, Mrs. Harris was 66 years old, somewhat obese, and had a medical history of diabetes and circulatory problems affecting the lower extremities. At approximately 4:50 p. m. on June 19, 1975, she was injured when struck by an automobile as she crossed the street near her home in Marksville, Louisiana. After being taken by ambulance to the Marksville General Hospital's emergency room, a preliminary examination and diagnosis was made. The examining physician noted that she was suffering from pain in both shoulders; that there was a possible fracture in this region; that there was a fracture of the right humerus; there was a possible fracture in the hip region; and there were lacerations of both knees. She was transferred from Marksville General to the Huey P. Long Memorial Hospital in Pineville, as it was better equipped to handle injuries involving fractures.
Mrs. Harris arrived at Huey P. Long Hospital and was received in the emergency room at 6:00 p. m. on Thursday, June 19. She was seen first by Dr. McFadden, who noted that her injuries included probable fractures. He recommended that she be examined by someone from the orthopaedics service.
Records at the hospital and notations by the physicians indicated that Mrs. Harris suffered from diabetes and that she had a medical history of varicose veins and poor circulation in both legs. It was also noted that she had had surgery for stripping the veins and that there was skin discoloration on both legs due to the various circulatory problems and the surgery. X-rays taken at the time of her hospital admission on June 19 indicated in addition to the fractures which were shown that there was extensive vascular calcification in both legs.
Dr. William Seidensticker, who was in his third year residency and on duty at the time, was called in to examine and treat Mrs. Harris. He attended her from approximately 6:00 p. m. to 11:00 p. m. June 19. During this time period, he performed what is referred to as a surgical prep and debridement of the left knee. This includes scrubbing some eight to twelve inches both above and below the knee with a betadine solution and betadine scrub, draping the wound with sterile dressing, removal of foreign material, irrigation of the wound, removal of devitalized tissue, and open suturing of the wound to make certain that it *385 would remain open and draining. After this procedure, a dressing was placed over the wound. The fracture of the right shoulder was reduced and the right arm was immobilized; the central fracture and dislocation of the right hip was set and the leg placed in traction by means of a pin inserted in the right proximal tibia.
After receiving treatment for her injuries, Mrs. Harris was taken to the orthopaedic ward of the hospital and placed in a two-bed room. There was testimony that the air conditioning was not functioning in the room and that at all times while she was in the hospital, at least one of Mrs. Harris' children (and in one instance a granddaughter) stayed with her.
From the evening of June 19 to the afternoon of June 21, Mrs. Harris was under the care of the nursing personnel of the hospital. She was administered medication which Dr. Seidensticker had ordered, including Demerol and Vistaril for pain. Ice packs which had been ordered for her right shoulder and her left knee were also applied. There was no sign of infection or unusual odor surrounding the knee wound found in the regular checks made by the nurses. There was never any decreased pulse in the lower extremities. There is a full record, written contemporaneously with the regular examination, in which all clinical signs are noted (i. e. all signs which could be observed), including all temperature readings. There are notations of complaints of pain in the various regions of injury and notations that the medication for pain was administered at the regular intervals as ordered by the treating physician. There was testimony from both nurses and physicians that administration of such medication must be spaced over certain periods of time.
Mrs. Harris' temperature remained fairly steadily near 100°, dropping to 99° once, on June 19 and June 20. Testimony from all physicians indicates that this was the normal thing to be expected from one who had received the extensive trauma of being struck by an automobile and who had the fractures, lacerations and bruises which comprised her injuries.
An intravenous drip and a catheter were ordered for Mrs. Harris, and use of both continued throughout her hospital stay. Mrs. Harris was seen again by Dr. Seidensticker on June 20. At this time, he examined the sites of the fractures and he examined the wound on her left knee. He noted that the latter was "OK". Throughout the day of Friday, June 20, Mrs. Harris continued to receive the regular visits from the nurses and to receive the pain medication and ice packs. Her complaints of pain were general for the areas of her injuries, with no specific location singled out. There were no medical indications of an infection to the wound in the left knee nor were any medically significant odors noted by the nurses or the doctor. Her temperature remained practically constant. The evening of June 20, there was the first noted complaint of a particular pain limited to the left knee; pain medication was administered at 11:30 that night. Again on the morning of June 21, there is a notation of a specific complaint of pain in the left knee and medication was administered at 4:15 a. m. Mrs. Harris' temperature dropped the morning of Saturday, June 21; the drop was to 98°, a below-normal temperature. Ice packs continued to be applied to Mrs. Harris' right shoulder and left knee. There was no indication of significant drainage from the wound in the knee or of any significant odor or infection from the wound.
Mrs. Harris' children had become dissatisfied with the attention which she received while in the Huey P. Long Hospital, and on the morning of Saturday, June 21, they indicated that they wished to have their mother transferred from that hospital to another in Alexandria. Arrangements for the transfer commenced that morning, and the actual transfer was made the afternoon of June 21.
Prior to the transfer, Mrs. Harris was seen by Dr. Anatolio Wasserman, another third-year resident in orthopaedics, who was covering the orthopaedic ward over the weekend. He noted that there was a rise in her temperature and ordered that some *386 tests be run to determine the cause, but they were not run as her children removed her from the hospital before that could be accomplished. There was testimony that Mrs. Harris did not wish to be moved from the Huey P. Long Hospital, but her children insisted upon the move. Her discharge from the hospital was one against medical advice.
Upon discharge, it was noted that the "wound on her knee was clean and that she had a significant rise in temperature.
Mrs. Harris was transferred to Rapides General Hospital in Alexandria, a private hospital, where she was admitted as a patient of Dr. T. E. Banks, an Alexandria physician who specializes in the practice of orthopaedics. Records from Rapides General indicate that she was admitted at 5:15 p. m., that her temperature was 99°, and that her temperature began to climb after admission. At the time of her arrival, Dr. Banks was in surgery and unable to see her until several hours later, or about 10:30 p.m.
Dr. Banks examined Mrs. Harris and noted in his report that she was incoherent in speech, thought and action. He indicated that the possible causes could be "due to some sedation, febrile reaction or multiple small emboli." Also the following notation is found:
"On the left side there was a dressing on the wound of the knee. This was released and there was found to be some subcutaneous blister formation on the posteromedial aspect of the thigh at the knee. The knee wound itself was a dirty jagged wound that was open and had not been sutured primarily. It was elected to leave it open. Examination of the extremities otherwise revealed scarred legs with no appreciable subcutaneous tissues. This was the result of old chronic varicosities with history of recurrent varicose ulcers, not active at this time. Pulsations of the feet were apparently normal. There was some discoloration on the medial aspect of the distal third of the thigh which was felt to be hematoma."
On this observation, he ordered the administration of a broad-spectrum antibiotic and changed the dressing on the wound. He also ordered a different pain medication, as he thought one of the causes of her incoherence could be the medication she had been receiving. Neither he nor any of the nursing personnel noted any medically significant odor about the knee wound. Testimony of several of the physicians was that when the doctors at Rapides General referred to the knee wound as "dirty", what they meant was that there was further necrosis at the site and there was pus to be found in the wound.
On Sunday, June 22, when Mrs. Harris was examined by Dr. Banks before he left the hospital, there was the first indication of a developing medical problem with the circulation to Mrs. Harris' left leg. Dr. Banks saw Mrs. Harris early that morning in response to notice by the nurses of a climb in her temperature, indicating several possibilities, though the cause could not be determined without further examination and tests. Another specialist was called for further consultation. There was testimony from several doctors that it was suspected that Mrs. Harris might be suffering from internal bleeding in the region of her hip/pelvis fracture, or there could be clotting of the blood or there could be some urological problem, any of which might be causing a rise in her temperature and the toxic reactions she was exhibiting.
Dr. Banks requested that Mrs. Harris be seen by Dr. Perdue, a specialist in internal medicine. She was seen later in the day on Sunday by Dr. Davis, Dr. Banks' partner, who also called in Dr. Wells, a urologist. By this time, she was exhibiting such symptoms as severe edema of the left leg and the abdominal region and also severe and large blistering of the thigh with the blisters containing a bloody substance. A surgeon, Dr. Hovnatanian, was called for consultation. Mrs. Harris was exhibiting tissue discoloration and other symptoms of blockage of blood supply to the left leg.
These doctors each examined Mrs. Harris and had extensive tests and x-rays taken. They ruled out the initial possibilities of *387 bleeding internal injuries, or blood clots, or a urological infection. It was not until Mrs. Harris' leg showed the severe swelling and discoloration early in the afternoon, and there had developed a noticeable odor (this is the first mention of any of the doctors made concerning an odor) that Drs. Davis and Hovnatanian together made the diagnosis, later to prove accurate, that Mrs. Harris was suffering from fulminating gas gangrene. At that point, she began receiving blood transfusions and was taken to an operating room where a fasciotomy was performed upon her upper leg and left abdominal region. She died while upon the operating table.
Testimony from Mrs. Harris' children indicated that their mother made extensive, specific complaints of pain limited to her left knee, which complaints were made from the inception of her hospital stay, and were ignored by nurses and doctors. One of Mrs. Harris' daughters did testify that her mother's complaints of pain were about pain all over and were not limited to complaints of pain in the knee. The children also testified that from the time of early Friday morning (June 20), the morning after the accident, there was an odor which the hospital personnel and doctors should have noticed and about which they made complaints which were ignored, the inference being that this odor was indicative of the inception of the gangrenous infection. This claim is contradicted to some extent by a lack of any notation made by nurses or doctors at the time, the specific testimony of all doctors as to the absence of any odor until Sunday morning, and the rather vague testimony of the children as to who, if anyone, actually informed the hospital personnel of the existence of that particular odor. There was a lack of air conditioning in the room at Huey P. Long, and it was suggested that this fact may have caused the odor to be noticeable to the Harris children.
The children also complained that Mrs. Harris had a swollen left leg while at Huey P. Long. This is contradicted by all of the medical testimony and notations by all medical personnel at both hospitals. Their notations were made at the time the doctors and nurses were examining and treating Mrs. Harris and before there was any question of a gas gangrene infection and a law suit. The evidence is that there was no swelling present until later Saturday evening or early Sunday morning.
There was another complaint that Mrs. Harris was showing blisters before she left Huey P. Long. The only evidence of any blisters was after arrival at Rapides General. The first blisters were felt to be in connection with adhesive tape and were noted Saturday night. No other blistering was remarked until Sunday.
Except for the testimony of Dr. Banks after he had been made a defendant (which testimony contradicts a deposition taken some seven months after the events) the medical evidence is uncontradicted that there was no indication of any problem with the wound on Mrs. Harris' leg, no indication of infection, nor anything out of the usual and expected until a temperature rise shortly before she was to be transferred out of Huey P. Long Hospital. At that point, there was nothing which could be done by personnel at Huey P. Long as the transfer was imminent. The wound was clean, i. e. free of foreign matter, though there was later developing necrosis (tissue death) which could call for a further debridement of the wound by removing the dead tissue if there was extensive necrosis. There is some indication that possibly the transfer of Mrs. Harris from one hospital to another may have prevented any earlier medical observation and treatment of her developing symptoms; the doctors stated that a continuous observation over a period of several days may be necessary in a diagnosis. In fact, Doctors Banks and Davis, who from their extensive experience were the most familiar with gas gangrene, did not make that diagnosis initially, Dr. Banks never making it and Dr. Davis not being able to make it until the several clinically observable symptoms were present on Sunday. From all of the testimony the symptoms began late Saturday and developed rapidly through Sunday morning to the point at *388 which the diagnosis was made early Sunday afternoon. Testimony that the wound was properly cleaned is contradicted only by the testimony of Dr. Banks, which again conflicted with his earlier deposition.
Testimony from all of the doctors indicates that the bacillus which causes gas gangrene is always present on the skin, in dirt and in the intestinal tract. It is also prevalent in areas where animals are. There is apparently no way in which all spores can be removed from the area of a wound, no matter how complete the cleaning may be, but that in most instances, the spores do not multiply because of their inability to develop in the presence of oxygen, which is the reason why wounds are kept open and draining. Development of gas gangrene would be most likely from deep, puncture-type wounds in which there would be no contact with oxygen. The development of gas gangrene is very rare, however there is no 100 percent prevention possible, particularly in wounds which become closed or which for some reason have an inadequate oxygen supply to the tissues. In relatively shallow wounds, such as the one in this case, it would not be expected that such an infection would develop. There was no indication that Mrs. Harris' wound had not been cleaned properly; indeed after several days and further tissue death along with a local infection characterized by pus, it would be impossible to state that the wound had not been properly cleaned at first. Certainly there was no foreign matter in the wound, as all doctors testified. No amount of antibiotics will have an effect on gas gangrene. The non-administration of antibiotics at Huey P. Long is in accord with more recent medical practice which delays drug use until there is an infection and it is known what infection is to be treated, particularly as some bacilli may develop resistance to treatment if there is an overuse of antibiotics. Even so, the only drug with any degree of effectiveness against gas gangrene is penicillin, which should be used with caution as there can be very severe side effects. In any event, even that is not the best treatment; the best is supplying oxygen to the infected area, as the bacillus is anaerobic, i. e. unable to survive in the presence of oxygen. Leaving the wound open was the best possible treatment.
Taking all of the factors together, probably the factors which contributed most to the development of gas gangrene were the conditions of Mrs. Harris' circulatory system and the existence of a diabetic condition, which together tended to inhibit the delivery of oxygen to the area of the injury, the probable situs of entry for the bacilli which caused the gas gangrene infection.
Once the bacilli begin to multiply, they lodge in the muscle tissue and necrosis begins to occur, with the release of a gas as a side effect. The spread of the infection is through the planes of muscle tissue, the spread being quicker when there is poor blood circulation, and the spread being almost always fatal when the point of infection is above the knee or above the elbow, as the muscle tissue of the upper arm and leg extends into the trunk area and so spreads to vital organs. Amputation of an infected limb may be of value if the infection originates below the knee or elbow. Absent that, the best treatment is a fasciotomy, or a cutting into the tissue of the muscles so as to bring oxygen to the area immediately and thus kill the bacilli.
The overwhelming effect of the medical evidence (consisting of the reports prepared contemporaneously with the treatment of Mrs. Harris, the depositions of doctors and nurses taken in January, 1976, and the trial testimony, with the limited exception of the changes in testimony by Dr. Banks who was by that time a defendant, as he was not at the time of his earlier deposition) is that there is no indication of any failure adequately to perform medical services or observation which led to the inception of the gas gangrene infection or the failure to discover or diagnose the presence of the infection by doctors and nurses at Huey P. Long Hospital. Allegations by the children of failure to treat observable symptoms is unsupported, as there is no indication of the presence of observable *389 symptoms before Saturday, when there was the rise in temperature; the more drastic symptoms did not appear until early Sunday morning, at which time prompt medical action was taken. The probability is that the primary factor contributing to the start and the later rapid spread of the infection was the poor circulatory system which Mrs. Harris had, inhibiting the proper supply of oxygen to her body tissues. That it is not possible to completely remove all bacteria from a laceration is a recognized limitation in any medical treatment, and the goal of treatment is to diagnose and treat any infection as soon as possible. One factor in more rapid diagnosis is long-term observation, which was broken in this case by the transfer of Mrs. Harris from one hospital to another. It is probable that, even so, the diagnosis would not have been made in time to save her life. Even doctors as experienced with the disease as Drs. Davis and Banks needed the objective, clinical symptoms before being able to make an accurate determination of the cause of the problems from which Mrs. Harris was suffering.
In connection with the standard to be applied by an appellate court in its constitutionally mandated review, the review of fact made by an appellate court must determine whether the district court was clearly wrong in its factual findings. Absent such a finding, the reviewing court should not disturb the findings of the trial court. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978).
The opinion of the trial court is amply supported by the full evidence presented in this case, and the Court of Appeal fulfilled its proper function in review. There was nothing clearly wrong with the finding of fact in either court, and the conclusions of law which follow are correct.
Accordingly, after extensive review of the facts presented at trial, we find that the decision was correct. We therefore affirm the opinion of the two lower courts.
AFFIRMED.
STONE, J., Ad Hoc, dissents.
NOTES
[*] Honorable JESSE N. STONE, Jr. served as Justice Ad Hoc in the vacancy created by the resignation of TATE, J.