427 So.2d 541 (1983)
Jessie BELMON, Jr., et al., Plaintiffs-Appellees,
v.
ST. FRANCES CABRINI HOSPITAL, et al., Defendant-Appellant.
No. 82-526.
Court of Appeal of Louisiana, Third Circuit.
February 3, 1983.
Rehearing Denied March 22, 1983.
*542 Gist, Methvin, Hughes & Munsterman, Howard B. Gist, Jr., Alexandria, for defendant-appellant.
Eugene Cicardo, and Antoon, Dalrymple & Beck, Joseph Dalrymple, Alexandria, for plaintiffs-appellees.
Before CUTRER, YELVERTON and KNOLL, JJ.
YELVERTON, Judge.
This is a hospital malpractice damage case. Plaintiffs are Jessie and Alice Belmon. Defendant is St. Frances Cabrini Hospital of Alexandria, Inc., (Cabrini).[1] The trial court found that the actions of two of Cabrini's employees amounted to a breach of the duty of care owed by the hospital to Mrs. Belmon while she was a patient there on August 12, 1980. The court found that this breach of duty was a cause in fact of the injuries suffered by Mrs. Belmon to her right arm and hand. From a judgment awarding plaintiffs damages totalling $57,376.15, Cabrini appeals. We affirm.
Before considering the specific issues raised on appeal we will narrate the facts as found by the district court.

Facts
Mrs. Belmon was admitted to Cabrini on August 11, 1980, with a diagnosis of a possible pulmonary embolus (a blood clot lodged in the lung). Her treating physician, Dr. James D. Knoepp, prescribed Heparin therapy, the recognized treatment for a suspected pulmonary embolism. Heparin is a potent anti-coagulant drug. Dr. Knoepp ordered the immediate administration of a 7500 unit bolus of Heparin in the emergency room. He then placed Mrs. Belmon in the hospital's intensive care unit (ICU), and ordered that she receive the anti-coagulant by continuous I.V. (intravenous) drip at the rate of 2000 units per hour to achieve maximum Heparinization. Mrs. Belmon was to remain overnight in ICU. Several tests were scheduled for the following day. Dr. Knoepp did not see the patient after admission until noon on August 12.
Mrs. Belmon spent the night uneventfully. At about 5:00 a.m. on August 12 Cabrini's medical technician, John Mabry, took a blood sample from her right arm.
At 6:30 a.m. Dr. Bryan Cole, a cardiologist, checked on plaintiff and found that she was alright.
Around 7:30 a.m. Mrs. Belmon began to experience pain in the right arm both below and above the elbow, as well as discoloration and swelling. She and her husband, who was with her in ICU, declared that they immediately called this to the attention of the ICU nurse, Shelia Bardwell. Nurse Bardwell saw the patient at least six times that morning between 7:30 and 11:50. The nurse noted on the patient's record that there were complaints of pain in the right arm at 9:30 a.m. and the upper arm was slightly swollen, but no hematoma was present. She checked the patient's blood pressure at 10:00 and again at 11:00. She made no notation of complaints of pain on either occasion and cannot remember *543 whether or not the patient's arm was still swollen. At 11:50 the patient was still complaining of pain so she called Dr. Knoepp. Nurse Bardwell stated that she saw no hematoma (which would have been evidenced by discoloration) at 11:50 or any other time.
Dr. Knoepp did not learn that something untoward was occurring until he received Nurse Bardwell's message at 11:50. Arriving ten minutes later at ICU, he discovered a large hematoma. He wrapped the arm and elevated it and immediately reduced the Heparin therapy by one-half. Two hours later Dr. Cole, by then having the benefit of a lung scan which ruled out pulmonary embolism, discontinued the Heparin completely.
Thereafter, the symptoms for which she was originally hospitalized having disappeared, Mrs. Belmon was treated only for the injury to her right arm and hand, the subject of damages in this case.
The medical testimony was unanimous that hemorrhage is a substantial risk in Heparin therapy. The most common is bleeding into the skin or soft tissue at needle puncture sites.
It was Dr. Knoepp's opinion that Mrs. Belmon's hematoma was a secondary hemorrhagic complication due to the combination of heparin, venepuncture and blood pressure cuff trauma. Further explaining, he said that the blood pressure cuff could have ruptured smaller blood vessels, or she could have had a venous or an arterial hematoma from the needle stick and this was aggravated by the blood pressure cuff.
The blood pressure cuff was on Mrs. Belmon's arm throughout the night and was there at 5:00 a.m. when the med-tech Mabry stuck her for the blood sample. Routine blood pressure checks using the cuff were made through the night and on an hourly basis during the morning of August 12.
Against this background of basic facts, we will now take up the issues raised by Cabrini on appeal. They are:
1. Was the conduct of Cabrini's employees the cause in fact of plaintiff's injuries?
2. What was the duty of care owed by the hospital to the plaintiff?
3. Did the duty of care owed by the hospital to the plaintiff encompass the risk of injury which occurred?
4. Did the defendant hospital breach the duty of care owed to the plaintiff?
5. Did the trial court improperly admit Nurse Kevil's testimony beyond her expertise?
6. Did the trial court err in assessing the amount of damages recoverable by plaintiffs?

Cause in Fact
In order for negligent conduct to be a cause in fact of a plaintiff's harm, it must be shown to be a substantial factor in causing the injury. Ducote v. Voorhies, 350 So.2d 1289 (La.App. 3rd Cir.1977).
The trial court found that the failure of John Mabry, the medical technician, to take proper precautions in drawing blood from the patient's arm at 5:00 A.M. on August 12 was a substantial factor in causing plaintiff's injury.
The preponderance of the medical testimony was that extra precautions should be taken in drawing blood from a Heparinized patient. The extra precautions require an exact stick and also that the puncture wound be held longer than in routine sticks. Mabry treated the taking of blood as a routine matter. He was unaware that the patient was Heparinized. Mrs. Belmon said he had to stick her five times. The medical testimony was that excessive bleeding from a vein puncture would take some time to be observable in the form of a hematoma. The trial court found that Mrs. Belmon's original symptoms began at 7:30 a.m. The proximity in time between the onset of symptoms and the taking of blood caused the court to think that this was a substantial cause in fact.
The lower court also blamed the inaction on the part of Nurse Bardwell for permitting Mrs. Belmon's injury to reach serious proportions before medical help was summoned. *544 The court found as a fact that Mrs. Belmon had voiced complaints of pain, discoloration and swelling, continuously after 7:30. The doctor was not called until noon. When Dr. Knoepp reached her bedside in ICU, he immediately commenced corrective measures. Had Nurse Bardwell called him sooner, the extent of damages more probably than not could have been minimized.
Causation is a question of fact, and our duty on appellate review of this finding of fact, as well as all factual findings hereafter to be considered, requires us to affirm in the absence of manifest error. Harris v. State, through Huey P. Long Mem. Hosp., 378 So.3d 383 (La.1979). We find no manifest error in the court's determination that the actions of Cabrini's employees were causes in fact of Mrs. Belmon's injuries. But for the drawing of the blood without the proper aftercare and the inaction of the duty nurse when faced with the signs of hemorrhage, the injury would not have happened.

The Hospital's Duty of Care
The duty owed by a hospital to its patients is to exercise the degree of care, skill and diligence that the particular patient's condition may require and protect the patient from his incapacities and external circumstances peculiarly within the hospital's control. Ulmer v. Baton Rouge General Hospital, 361 So.2d 1238 (La.App. 1st Cir.1978); Bryant v. St. Paul Fire and Marine Ins. Co., 365 So.2d 537 (La.App. 3rd Cir.1978), writ denied 367 So.2d 1184 (La. 1979); Harris v. State, through Huey P. Long Hospital, 371 So.2d 1221 (La.App. 3rd Cir.1979), affirmed 378 So.2d 383 (La.1979).
Cabrini's liability is vicarious, based on the substandard conduct of its ICU nurse, Shelia Bardwell, and its medical technician, John Mabry.
Nurses and medical technicians who undertake to perform medical services are subject to the same rules relating to the duty of care and liability as are physicians in the performance of professional services. Butler v. Louisiana State Board of Education, 331 So.2d 192 (La.App. 3rd Cir.1976); Harris v. State, through Huey P. Long Memorial Hospital, supra.
The standard of care of a physician is to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case. Meyer v. St. Paul-Mercury Indemnity Co., 73 So.2d 781 (La.1953); Butler v. Louisiana State Board of Education, supra; Harris v. State, through Huey P. Long Memorial Hospital, supra.

Duty/Risk
A hospital's standard of care requires that a patient be protected from dangers that may result from the patient's particular condition or which a reasonable person under the circumstances would anticipate. The medical evidence is uncontradicted that the major known complication in the use of Heparin is hemorrhage. The risk of bleeding at needle puncture sites is well known. Pressure, such as might be caused by a blood pressure cuff, may also produce hemorrhaging and pressure should be avoided.
For these reasons a Heparinized patient must be carefully monitored at all times. The risk encountered by Mrs. Belmon was within the scope of protection of the duty of care imposed upon the hospital in this case.

Breach of Duty
The trial court found that Cabrini breached its duty toward Mrs. Belmon because neither the nurse nor the med tech approached their duties with a proper understanding of the hemorrhage-prone vulnerability of a Heparinized patient. As a consequence, the med tech drew blood in ignorance of the fact that plaintiff was Heparinized and without observing the extra precautions required in such cases. The nurse, for want of training or instruction, *545 failed to recognize and respond properly to the signs of hemorrhage in Heparinized patient.
These conclusions were based on substantial evidence. Mabry, the med tech, admitted that he was unaware the patient was Heparinized or that extra precautions were, in any event, necessary. He followed his usual practice, used the cuff as a tourniquet, drew blood, then directed the patient to fold her arm. The medical testimony was unanimous that for such patients the puncture wound should be held longer, one doctor requiring holding it for ten minutes. Also, the arm should not be folded; this encourages rather than inhibits hemorrhaging.
Nurse Bardwell, though aware that the patient was being Heparinized, did not promptly respond to the complaints of pain, swelling and discoloration in plaintiff's arm. The trial court found this inaction took place from 7:30 to 11:50 a.m. She was aware of pain and swelling throughout this time as her notes indicate. She denied ever seeing a hematoma, even at 11:50 when she called the doctor, but when Dr. Knoepp came ten minutes later, he found a large hematoma.
Dr. V.F. Chicola testified that if blood gets into the issues (evidenced by pain and swelling), the nurse should immediately call the doctor. Dr. Knoepp stated that a small amount of swelling might not be cause for undue concern, but if a patient is hemorrhaging he would expect an ICU nurse to immediately call him. Similarly, Dr. Gordon L. Hovratanian said that a person on Heparin should be watched closely and if a large dose was being administered (as here) and the patient developed pain and swelling in the arm, he would want the nurse to let him know.
All of these doctors were practitioners in the Alexandria medical community.
Theresa Kevil, an assistant professor of Nursing at Northwestern State University with a specialty in cardio-vascular nursing in the intensive care area, testified for plaintiff. She said that when Heparin is being administered it is the duty of the attending nurse to observe for any sign of hemorrhage. A nurse should be especially vigilant in monitoring a patient receiving a heavy dose of Heparin as was Mrs. Belmon. At the first evidence of bleeding the doctor should be called.
The trial court correctly found that the hospital, through its employees, breached its duty of care to the plaintiff.
The Expertise of Professor Kevil
Appellant contends that Nurse Kevil's testimony was improperly permitted to go beyond the field of nursing and invade that of the physician. Specifically, Nurse Kevil is accused of having gone beyond her expertise when she testified that the duty of care increases as the PTT value increases.
Most of the doctors and to some extent Nurse Kevil testified about the relationship between the PTT value and hemorrhage from Heparinization. The "PTT value" means the time in seconds it takes the blood to clot. Mrs. Belmon's normal PTT was 27.8 seconds. Medical scientists disagree as to the parameters, expressed in PTT value, of adequate Heparinization. One school of thoughtand some of the doctors who testified in this case belonged to that school believe that Heparinization is achieved when clotting time is increased to two and a half times the base, which in Mrs. Belmon's case would have been about 70 seconds. At higher levels the risk of hemorrhage outweighs the benefits of increased clotting time. Nurse Kevil was taught according to this school and based her evaluation of an ICU nurse's duties on its precepts.
Another school, of which Dr. Knoepp was a proponent, thinks the risk of hemorrhage does not increase apace with clotting time, and that Heparinization in life threatening situations is not achieved until the maximum reading on the PTT machine is attained, 180 seconds. This was the extent to which Mrs. Belmon was Heparinized.
We gather from the testimony that while the administration of Heparin is of undoubted proven benefit to a blood clot patient, in the words of Dr. Knoepp: "... *546 nobody has conclusively determined the exact best way to give it, how much to give it, or how little to give."
Under these circumstances we think that it was entirely proper for Nurse Kevil to testify, without invading the physicians's field of expertise, that an ICU nurse should diligently monitor any Heparinized patient, and should be especially attentive to one who has received maximum Heparinization. It is the nursing standard of care that is one of the questions in this case. Therefore, Nurse Kevil's expertise addressed a precise issue before the court.
Even were we to disregard entirely the testimony of Nurse Kevil, however, there is sufficient medical support in the record for us to say that the trial court was not clearly wrong in finding that the conduct of the hospital's employees was below the standard of care required under the circumstances of this case.
We now turn to the final assignment of error, the amount of damages awarded.

Damages
The award was $55,000 for loss of income, permanent disability and pain and suffering, together with $2,376.15 for medical expenses. Mr. Belmon incurred other medical expenses but these were either absorbed or paid by Cabrini.
Mrs. Belmon remained hospitalized four days at Cabrini receiving treatment for the arm injury. Photographs in the record taken shortly after her release show extensive discoloration on the inside of her arm above and below the elbow. She suffered considerable pain. At trial, 21 months following the accident, she was still experiencing weakness and tremors in the hand and arm with occasional pain.
The evidence supports the trial court's finding that she suffered some permanent damage to the right median and radial nerves, together with permanent muscle damage in her right hand and arm.
She lost almost half a year of work. She is right-handed. Because the injury has limited the motor function of her hand, she has been unable to fully perform her work as a physical therapist's assistant. Her ability to write and perform other functions of the hand required in her work will be limited.
An abuse of trial court discretion must be clearly demonstrated by the record before an appellate court will tamper with an award of general damages. Ulmer v. Baton Rouge General Hospital, supra. The award of $55,000 in general damages in this case is not an abuse of discretion.

CONCLUSION
For the reasons assigned, we affirm the judgment appealed from in favor of Jessie and Alice Belmon and against St. Frances Cabrini Hospital of Alexandria, Inc., in the amount of $57,376.15, and costs. All costs of appeal are to be paid by appellant.
AFFIRMED.
NOTES
[1] The only other defendant, John Mabry, Cabrini's laboratory technician, was dismissed by the district court at the conclusion of the trial. No appeal has been taken from that dismissal.