BOWES, Judge.
Appellant Sandra Nathan (Nathan) appeals a jury verdict and the judgment adopting it awarding her $12,500 in damages. She was injured by falling lumber in a Home Depot store and, on appeal, avers that the judgment in her favor was inadequate to compensate for her damages. We revise the judgment by increasing the award for medical expenses slightly, and, as revised, affirm.
Ms. Nathan is an attorney. On July 20, 1985, she went to the Home Depot store to buy material for a dog pen. While walking down an aisle of the store, a piece of lumber fell from an overhead shelf. Just before the lumber hit her, Ms. Nathan put her hands up to ward off a blow to her head, twisting to get out of the way. The lumber hit her right wrist and arm, causing injury. She went to the emergency room at St. Charles General Hospital, where she was X-rayed. Four days later, after the pain did not abate, she consulted Dr. John Watermeier, who diagnosed a fractured wrist and ordered a small cast.
Several days later, Ms. Nathan again visited Dr. Watermeier, still complaining of wrist pain radiating up into the elbow and arm, and into the shoulder. He felt she might have a nerve injury known as shoulder-hand syndrome, and a twisting injury. She continued to return for treatment, continuing to complain of the radiating pain from wrist and shoulder. On August 20, 1985, Dr. Watermeier ordered certain diagnostic tests. A thermogram revealed an “abnormal C5-6 nerve fiber pattern which *713 is not changed substantially from the previous films.” (This thermogram will be discussed further, infra). Ms. Nathan also underwent a needle EMG and a nerve conduction study which showed nerve problems in the area between the elbow and wrist. No findings during these tests indicated a cervical disc problem, although the tests did not completely eliminate that possibility, since the examination was not designed to rule out a cervical nerve root problem.
She continued treatment by Dr. Water-meier, and received some physical therapy, which did not improve her condition. In November, she had an improved range of motion in her shoulder and less pain. In December, she began to complain of neck pain and, at this time, her diagnosis was changed from “right distal radius fracture” to “cervical disc syndrome.” In January, 1986, Dr. Watermeier ordered a CAT scan, Magnetic Resonance Image (MRI) and a discogram. The tests showed bulging cervical discs at three levels, as well as a “boney spur” at the sixth cervical vertebra. Dr. Watermeier diagnosed a cervical bulging disc syndrome and further felt that the tests indicated there was at least one herniated disc involved.
Conservative treatment consisting of medication and more physical therapy failed, and, in February, 1987, Ms. Nathan underwent surgery for a cervical disc fusion. Later that month, trial was held, resulting in the verdict and judgment on appeal. After the trial, the jury was polled; at least nine jurors agreed that the defendant Home Depot was negligent and that such negligence was a cause in fact of the accident (Home Depot’s liability has not been appealed). These nine jurors agreed that the award for medical expenses should be five hundred dollars, but the jury could not initially agree on an award for general damages. After returning again to the jury room, a verdict of twelve thousand dollars in general damages was returned.
Plaintiff argues, and we agree, that the jury would have had to award a larger judgment for medical expenses if it had decided that Ms. Nathan’s neck problem was a result of the accident, since the stipulated medical expenses paid by her eq-ualled $3,911.91 from the date of the injury to January, 1987, and the expenses of surgery totalled $14,964.95. Therefore, plaintiff argues that the jury’s failure to find that she sustained any type of neck injury, or disc injury, and the failure to award any amount for such injury, was manifest error.
Dr. Watermeier testified that based on Ms. Nathan’s history, with no intervening severe injuries, the cause of the disc problem was the accident at Home Depot. He did not state with absolute certainty that the accident was the sole cause of the herniated disc, but rather opined that the incident “aggravated” or “activated” plaintiff’s condition.
It was brought out at trial that Ms. Nathan had a history of previous cervical problems, beginning with an auto accident in 1974, which caused “cervical strain” for which she was treated about eight months; a “stiff neck” in 1977, which X-rays revealed “a definite mobility range between 4 and 5”; and a “spontaneous onset of severe neck pain” in June, 1984, “with radiation to the right upper extremity ... no history of trauma, etc.” X-rays at that time showed a “very mild narrowing at two (unspecified) cervical regions.” Dr. Ma-nale, one of the other physicians who treated Ms. Nathan at the orthopedic clinic along with Drs. Watermeier, Phillips, and Adatto, stated at that time: “I suspect she has cervical radiculitis, diskogenic type pain.” A thermogram was run in 1984, during this complaint, in which a “coolness” on the left was noted. When the 1984 thermogram was compared with the 1985 thermogram (taken after the accident), Dr. Adatto of the Orthopedic Clinic interpreted an “Abnormal C5-C6 nerve fiber pattern which is not changed substantially from the previous films.”
Counsel for defendant skillfully elicited from Dr. Watermeier the observation that the only objective tests conducted both before the accident and afterward, the ther-mogram, had been diagnosed as being essentially unchanged by one of Dr. Water- *714 meier’s partners. Nevertheless, Dr. Wat-ermeier testified that it did not appear from Ms. Nathan’s record that she had previously had a herniated disc problem, apparently disagreeing with Dr. Adatto’s interpretation. We note also that Ms. Nathan’s complaints following the accident were of pain radiating up her arm toward the shoulder, yet, according to Dr. Water-meier, the usual sign of a cervical disc injury is pain radiating down from the shoulder area to the arms (as in the June, 1984, complaint).
Dr. Gordon Nutnik examined Ms. Nathan for a second opinion as required by her medical insurance. After Dr. Nutnik examined plaintiff and reviewed the diagnostic tests, he concluded that there was a herniated disc at C6-7 which would require surgery. Furthermore, Dr. Nutnik felt that the accident as described could definitely be related to Ms. Nathan’s problems, and that a twisting injury can definitely injure a disc. However, when presented with the June, 1984, entry on Ms. Nathan’s chart indicating complaints similar to her neck pains following the accident, Dr. Nut-nik stated that the possibility of a nerve root compression (in 1984) would have been part of his differential diagnosis. He testified that he would not have been certain of that diagnosis unless he had had the diagnostic studies run.
Dr. James Williams examined plaintiff on behalf of the defendants. He also reviewed the diagnostic tests and testified that he felt she had most likely sustained a cervical strain, but that she had not had a ruptured disc. He disagreed with the diagnoses of Drs. Watermeier and Nutnik, opining that the bulge at C6-7 was probably a calcification, which was primarily posterior, and not bulging to the side so as to impinge on the nerve roots. Dr. Williams further testified that the accident could not have caused a herniated disc.
Ms. Nathan herself testified that, after the accident, she experienced pain in her arm, wrist, elbow and shoulder. Once her wrist began to heal, she felt the pain mostly going down her arm, although it had been radiating in both directions. She did not begin to experience pain in her neck until December, 1985 (some 4 to 5 months later).
In comparing her 1985 complaints to her condition in 1984, she testified that in 1984 she had experienced more neck pain, with some pain radiating down her shoulders and (right) arm.
In reviewing the record and particularly the above testimony and Ms. Nathan’s previous medical history, we find that the jury could have reasonably concluded that Ms. Nathan’s cervical disc problem pre-dated the accident and that the accident did not aggravate the pre-existing condition. Ms. Nathan experienced numerous cervical problems before the accident, most notably in June, 1984, when similar symptoms presented themselves. Moreover, she did not experience the cervical pain until December, 1985, about five months after the accident. We conclude that while the jury could have relied on testimony of Dr. Wat-ermeier that the accident caused or aggravated the disc injury, there was certainly a sufficient basis for their reliance upon the conflicting medical testimony and their apparent finding that the herniated disc was not related to the accident.
The jurisprudence is firmly established that the appellate court should not disturb reasonable findings of the trial court when there is conflict in the testimony, even though the court may feel that its own evaluations and inferences are just as reasonable. Even though we might have decided the case differently, when there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court’s finding, on review the appellate court must not disturb this factual finding in the absence of manifest error. Canter v. Koehring Co., 283 So.2d 716 (La.1973); T & G Salvage, Inc. v. Port Petroleum, Inc., 496 So.2d 1386 (La.App. 3 Cir.1986). Manifestly erroneous means clearly wrong; a finding of fact should not be disturbed unless it is clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Harris v. State through Huey P. Long Mem. Hosp., 378 So.2d 383 (La. *715 1979). Questions of negligence and causation are factual determinations of the trier of fact and, as such, must be reviewed under the “manifest error” standard. Pizzaloto v. Hoover Co., 486 So.2d 124 (La.App. 5 Cir.1986). We find none here in this conclusion of the jury.
Appellant correctly argues that the testimony of Dr. Watermeier as her treating physician is entitled to more weight than that of a non-treating physician. Cason v. Diamond M Drilling Co., 436 So.2d 1245 (La.App. 1 Cir.1983); Berthelot v. Imes, 459 So.2d 1384 (La.App. 1 Cir.1984). However, it is also correct that:
... Where the testimony of expert witnesses differs, it is largely a matter of fact for the jury to determine the most credible evidence, and a finding of fact in this regard will not be overturned unless manifest error appears in the record. A jury verdict should be maintained unless the record reflects that its conclusions of fact are not supported by the evidence, or its application of the law is clearly erroneous. Nailor v. International Harvester Co., 430 So.2d 784 (La.App. 5 Cir.1983); St. Pierre v. Gabel, 351 So.2d 821 (La.App. 1 Cir.1977).
Thus, while Dr. Watermeier felt strongly that the accident aggravated the pre-exist-ing cervical problem, there was sufficient evidence for the jury to conclude otherwise —the similar interpretations of the two thermograms — one before and one after the accident; the opinion of Dr. Williams that the accident could not have caused such injury; the statement of Dr. Nutnik that Ms. Nathan’s pre-accident symptoms might at that time have been the basis of a diagnosis of nerve root compression; and, most notably, the onset of related symptoms did not occur until months after the accident — all facts, which taken together, provide a reasonable basis for the jury’s findings. We are unable to say that the jury was clearly wrong in its determination that Ms. Nathan’s disc problem was unrelated to the accident.
However, the jury clearly erred in assessing the amount of damages for medical expenses. The record is uncontradicted that she had numerous medical bills which were incurred before the involvement of the cervical disc, that is, prior to December 31, 1985. The bills were admitted into evidence and show the following expenses incurred as a result of the accident prior to the onset of Ms. Nathan’s neck complaints:
St. Charles Hospital Emergency Room $ 199.80
Radiology Consultants (ER reading) 43.00
EMG 280.00
Dr. Watermeier (prior to 12/31/85) 427.00
Medication 135.04
Physical Therapy 360.50
Total $1,445.34
Therefore, the award of $500.00 for medical expenses was clearly insufficient, and we revise the judgment to reflect that such award is $1,445.34.
For the foregoing reasons, the judgment of the trial court awarding Ms. Nathan general damages in the amount of $12,000 is affirmed; the award for medical expenses is increased and revised to read $1,445.34, and, as revised, the judgment is affirmed. The award is thus:
General Damages $12,000.00
Medical Expenses 1,445.34
Total $13,445.34
Each party is taxed his own costs of this appeal.
REVISED IN PART AND, AS REVISED, AFFIRMED.