400 So.2d 1127 (1981)
Gail Horne RAY
v.
AMERI-CARE HOSPITAL et al.
No. 14010.
Court of Appeal of Louisiana, First Circuit.
April 13, 1981.
Writ Denied September 11, 1981.
*1130 James A. Gray, II, New Orleans, for plaintiff-appellant Gail Horne Ray.
Roger Fritchie, Hansen Scobee, Baton Rouge, for defendant-appellee Dr. Frank A. Silva.
Ronald A. Seale, A. G. Seale, Baton Rouge, for defendants-appellees Carl G. Murphy and Gulf Ins. Co.
David W. Robinson, Baton Rouge, for defendant The Merit Corp. of Tenn.
Before COVINGTON, CHIASSON and LEAR, JJ.
COVINGTON, Judge.
This suit seeks to recover damages for the wrongful death of George E. Ray who died on January 19, 1976, in the Ameri-Care Hospital after being admitted to that facility by Dr. F. A. Silva for psychiatric treatment following a diagnosis of schizophrenia, paranoid type. The plaintiff is Gail Horne Ray, the widow of the deceased. The defendants are Ameri-Care Hospital; its insurer, Gulf Insurance Company; its administrator, Carl G. Murphy; and Dr. F. A. Silva, a psychiatrist.[1] After trial by jury, verdict was returned by the jury in favor of all defendants, with the trial court signing a judgment in accordance therewith.
In January of 1976, Mr. Ray, an employee of Exxon, began to act in a strange manner which caused his wife to realize that he needed medical attention. Through a friend, Thomas Morris, Ray was persuaded to consult with the company physician, Dr. Jones. After examination, Dr. Jones felt that Ray might have a chemical imbalance and should be admitted to the psychiatric ward at Ameri-Care, so he was sent there. The hospital was located on the fourth floor of the building now known as the Baton Rouge General Hospital annex on North Boulevard in Baton Rouge. It was a private psychiatric hospital which was planned primarily as a short-term facility and which received all psychiatric admissions in the Baton Rouge area at that time, except for those sent to the unit at Earl K. Long Hospital. The hospital, which was not housed in a general hospital, had facilities to handle 50 patients; but at the time of Ray's hospitalization, it was not filled to capacity, having about 23 patients.
Mr. Ray was admitted on Friday, January 16, 1976, and his history taken. He was first seen by Dr. F. A. Silva that evening. The doctor found him "delusional," and diagnosed *1131 him as "paranoid schizophrenic." "Routine orders" were given by Dr. Silva.
Dr. Silva testified at the trial that Mr. Ray had been indirectly referred to him by Dr. Jones, the doctor for Ray's employer, Exxon. When first Dr. Silva saw Ray, he was "anxious, confused, disorganized and delusional." The patient's history reflected that Ray had a delusion that he only needed "energy" to survive, so he had not taken any nourishment for three days. He requested a medical certificate to prove that he was not dead, presumably to back up his theory of survival-on-energy-alone.
"Routine orders" meant that the doctor did not consider that constant visual contact or mechanical restraint was needed, but that observation at frequent intervals of 30 minutes should be made, and that other normal routine care and treatment should be administered to the patient.
The patient seemed to be responding as could be expected, until the doctor received a phone call on Saturday that he was needed at the hospital due to Ray's reaction to an attempt by a lab technician to draw blood for tests. Mr. Ray, who was a large man, had become frightened and agitated at the prospect of having blood taken and was strongly resisting any such efforts. Upon his arrival at the hospital, Dr. Silva found that Ray was hallucinating. He appeared to hear voices. The doctor prescribed Haldol, a medication used for this type of condition. Dr. Silva then issued more orders, limiting visitors to the immediate family. The doctor did not consider visual contact (close supervision at ten minute intervals) was called for; and thought that if Mr. Ray were placed in a small cell (one used for close supervision), it would heighten his paranoia and have done him more harm than good. He also considered that strapping Ray to his bed or using other forms of mechanical restraint would have had seriously detrimental effects on the patient. Despite his reaction to the taking of his blood, Ray seemed on the whole to be calmer and to be improving. The patient appeared to have had a restful night; he was dressing himself appropriately, taking short walks out of his room and addressing persons he came in contact with in a pleasant manner. Dr. Silva felt that Ray's condition was such that in due course he could have returned to a productive life, but would probably have needed to remain on medication.
In the early morning hours of Monday, January 19, 1976, Mr. Ray was found drowned in the bathtub, presumably following an attempt to conduct an experiment as a result of a strange delusion that he was able to breathe under water. There was no indication that he had committed suicide.
In time, a suit for his wrongful death was filed by Mrs. Ray. The plaintiff requested that her suit be tried by jury; the trial lasted four days beginning January 21, 1980, with the jury's verdict and the judgment in favor of the defendants. The plaintiff has appealed. We affirm.
Dr. Henry R. Olivier, a psychiatrist and chief of staff at the hospital, testified that he would not have felt any undue concern about Ray killing himself. He saw no need for mechanical restraints or visual contact. Dr. Olivier indicated that he would not have anticipated that Ray would try to breathe under water.
Dr. Robert L. Newman, Jr., a psychiatrist at Touro in New Orleans, indicated that his treatment of a patient in Ray's condition would have been along lines similar to those used by Dr. Silva.
Marie Landry, Assistant Director of Nursing at the hospital, testified from the records that there was no indication that Mr. Ray was hostile or combative. He was cooperative. There was no need of visual contact or mechanical restraint. She stated that mechanical restraints on a paranoid person are always a last resort.
From the hospital records, Mrs. Landry indicated that as an expert in her field, she would not have anticipated that a man in Ray's condition would attempt to put his head under water and try to breathe.
Carolyn Commenia, a nurse on duty at the time, stated that the patients were checked or observed at 30-minute intervals. *1132 Ray was not hostile, and gave no indication that he would try to hurt himself or others, or attempt to breathe under water, or try any other dangerous experiment or activity.
Thomas Morris, a close friend of the deceased, testified that Mr. Ray agreed to go to the psychiatrist only because he wanted to prove to everyone that he was sane, not because he thought anything was wrong with him. Morris described some of the strange behavior of Ray which had caused his wife and friends to think he needed medical help. He did not consider there was any risk of Ray trying to breathe under water. He did not anticipate any danger to Ray.
Mrs. Ray indicated that the possibility of Ray's attempting to breathe under water had not previously come up. She gave the information that Ray's employer's doctor, Dr. Jones, after examination, felt that Ray might have a chemical imbalance and ought to be admitted to the psychiatric ward at Ameri-Care. Mrs. Ray was informed of this disposition over the phone. Mrs. Ray briefly visited him and she also talked with him over the phone.
They knew he was acting strangely and they just wanted to see what his problem was. No one was really concerned about his problem being of a serious nature at that time.
On this appeal, the plaintiff takes the position that the trial jury erred in failing to apply the doctrine of res ipsa loquitur to the facts of the instant case, and in finding that the defendants had carried the burden of proving that the death of the deceased did not result from negligence on their part. As a corollary, the appellant contends that the violation of a safety regulation by the hospital constituted negligence; that the hospital staff failed to provide proper supervision for the deceased; and that the hospital's agents were negligent in their actions when they found the patient face down in the tub of water. The appellant also urges that Dr. Silva was negligent in his evaluation of the deceased and in his failure to give proper orders in regard to the safety of his patient.
The appellant further argues that the trial judge erred in failing to properly charge the jury on the standard of care by which the duty of the hospital and doctor toward the patient should have been measured and the type of evidence that could be considered in determining the negligence of the defendants.
The appellant first argues that the jury erred in failing to conclude that the doctrine of res ipsa loquitur applied and to properly apply the doctrine. The judge charged the jury as follows:
"In the ordinary case, the mere fact that the plaintiff may have suffered harm does not furnish evidence that it was caused by anyone's negligence, and the plaintiff must introduce other evidence of some negligence on the part of the defendant. In a few exceptional cases, the circumstances involved in or connected with an accident are of such an unusual character as to justify, in the absence of other evidence bearing on the subject, the inference that the accident was due to negligence of the person having control of the thing which caused the injury. In determining whether the hospital is at fault, you may infer that because all of the circumstances surrounding the accident are of such a character that, unless an explanation can be given, the only fair and reasonable conclusion is that the accident was due to some omission of the defendant's duty.
"In order to infer that the accident was due to the negligence of the hospital, the plaintiff must show:
"(1) A superior knowledge on the part of the hospital as to the cause of the accident;
"(2) The absence [or] unavailability of direct evidence of negligence;
"(3) The existence of a sufficient duty on the part of the hospital to use due care; and
"(4) Proof the accident or injury (in this case death) and the hospital's relation thereto.

*1133 "Therefore, if you determine that the thing which caused the death of Mr. Ray to be under the exclusive management or control of the hospital, and his death would not have occurred in the ordinary course of events if the one having such management and control used proper care, then it may be presumed that the death arose from the hospital's want of care.
"This is simply another formulation of the burden of a plaintiff in a tort action to prove that, more probable than not, the death was caused by the negligence of the hospital. If you believe from the fact of the accident itself and from the other evidence offered by the plaintiff that the hospital's negligence is the most plausible explanation for the death of Mr. Ray, you may return a verdict for the plaintiff. If, on the other hand, you are not convinced by the plaintiff's evidence that it was the hospital's negligence rather than some other cause which is the most plausible explanation, then you must return a verdict for the hospital."
The doctrine of res ipsa loquitur is an evidentiary principle, the applicability of which may only be determined at the conclusion of the trial. Garrison v. Hotel Dieu, 319 So.2d 557 (La.App. 4 Cir. 1975), writ denied, 323 So.2d 129 (La.1975).
In the case of McCann v. Baton Rouge General Hospital, 276 So.2d 259 (La. 1973), our Supreme Court applied the doctrine of res ipsa loquitur in a medical malpractice case. In the course of its opinion, the Court pointed out that res ipsa loquitur is a rule of circumstantial evidence. Where there is no direct evidence to show the cause of injury, and the circumstantial evidence suggests the negligence of the defendant as the most plausible explanation of the injury (or death) the doctrine applies.
In McCann, supra at 261, the Court remarked:
"When, as here, the injury occurred within the confines of the special service rooms at the hospital, the failure to allege the specific acts of the defendant producing the injury cannot vitiate the cause of action. The surrounding circumstances are peculiarly within the knowledge of the defendants or their employees and unavailable to plaintiff."
The doctrine of res ipsa loquitur is properly applied when the accident is of a kind that does not ordinarily occur in the absence of negligence; the injury was caused by an agency or instrumentality within the control of the defendant; and evidence as to the cause of the accident is more readily available to the defendant. See Boudreaux v. American Insurance Company, 262 La. 721, 264 So.2d 621 (1972).
Res ipsa loquitur means only that the fact of the occurrence warrants an inference of negligence, not that it compels such an inference; that the doctrine is grounded on the principle that such instances do not commonly occur in the absence of negligence; and, that the lack of direct evidence indicating the defendant's negligence as the cause of the injury furnishes the occasion and necessity for invoking the rule.
In Boudreaux v. American Insurance Company, supra, the Court in describing the factual circumstances in which the rule of res ipsa loquitur should be applied stated it was when the inference of defendant's negligence was the "most plausible explanation" or the "most probable cause" of the injury. If the evidence inferentially suggests the defendant's negligence as the more plausible explanation, then the trier of fact must be satisfied that the party against whom the inference of negligence arises has satisfactorily brought forward evidence that would exculpate him from liability.
Once it is determined that the doctrine of res ipsa loquitur is applicable, the burden of proof is shifted to the defendant to show an absence of negligence. Holliday v. Peden, 359 So.2d 640 (La.App. 1 Cir. 1978).
The defendants have attempted to sustain their burden by offering proof that in the case of the specialist he has measured *1134 up to the standard of care as announced by our Supreme Court in Ardoin v. Hartford Accident & Indemnity Company, 360 So.2d 1331 (La.1978), and that in the case of the hospital it has measured up to the jurisprudential standard of care set out in Bryant v. St. Paul Fire & Marine Insurance Co., 365 So.2d 537 (La.App. 3 Cir. 1978), writ denied, 367 So.2d 1184 (La.1979).
The appellant relies strongly upon Boudreaux v. American Insurance Company, supra, in support of her contentions. Boudreaux does not necessarily dictate an ultimate conclusion of negligence. It is clearly within the province of the trier of fact (the jury here) to apply the doctrine, and conclude that the defendant has discharged its burden of proof, and has thus exculpated itself from liability. The issue thus raised in the case at bar is whether the jury had sufficient evidence before it to conclude that the defendants were not negligent even if res ipsa loquitur were applied in accordance with the instructions of the trial court.
An examination of the evidence indicates that the jury was justified in concluding that the hospital and the doctor exercised due care with respect to Mr. Ray, and that his death was not the result of negligence on the part of any defendant.
The jury heard testimony, which it chose to believe, that a history was taken from Mr. Ray himself upon admission and that the Social Services department of the hospital attempted to contact Mrs. Ray until 8:30 p. m. on that Saturday evening in an attempt to obtain a further history in the case.
Appellant argued to the jury that Thomas Morris, the friend who was with Mr. Ray on his admission to the hospital, knew of Ray's delusion that he could breathe under water, and this information was not obtained from Mr. Morris by the hospital staff. However, the jury also heard Mr. Morris testify that he spoke with the nurse on duty but that he didn't go into Ray's theories or delusions. More importantly, Mr. Morris testified:
"Q. Now, Mr. Morris, in all fairness to both sides, and I know that you want to be fair, when you took George Ray to that hospital you were not afraid that he was going to go up there and try to breathe under water, now, were you Mr. Morris? That was not your major concern was it?
A. That was not my major concern at that time.
* * * * * *
Q. All right. So, when that man went to the hospital it was not a concern to you that he was going to go up there and try to breathe under water? Is that correct?
A. That's correct.
* * * * * *
Q. All right. And not only, Mr. Morris, did you not think that he would try to breathe under water, is it not also a fact that you didn't take any of these theories that he had too seriously on that day or during that time period?
A. That's correct. I didn't take
* * * * * *
Q. I understand. The only thing I'm trying to ask you, and I may not be asking my question good, is that if you thought that the man was going to do that at the hospital, when you were up there you would have told somebody, wouldn't you? You wouldn't have gone off and kept it to yourself? What I'm saying, Mr. Morris, is that I know you are a good friend of the man
A. Well, look
Q. Let me finish my question. You wouldn't say, Well, by George, they didn't ask me so I'm not going to tell them. I sure hope he don't do it. I mean, you wouldn't have approached it that way, would you?
A. I don't think I would have."
Mrs. Ray testified that she was not aware of any previous experiment involving breathing under water and was not concerned *1135 that Mr. Ray might try to injure himself.
Doctors Newman and Olivier testified that if they had been aware of a previous delusion concerning one's ability to breathe under water that they would not necessarily have altered the treatment plan, but would be more inclined to look on such thoughts as a litany of delusions.
In further explaining the problem of treating delusional patients, Dr. Silva testified:
"Q. Okay. You indicated that if you knew he had a fantasy about being able to fly you would have taken precautions about him going out of the window, for example?
A. Yes.
Q. Okay.
A. But, on the other hand, there is no way that we can take precautions for every possible delusion that a person might have because then we would probably have to keep the person asleep or something. There is no way you can take precautions for every possible delusion that a person might have. You know, some person might feel like they can eat something and, you know, those delusions vary. A person like Mr. Ray could have had a delusion that he could eat a mattress or that he couldthe delusions do not remain static of the same type, but they vary, you know, today it may be that you can fly, tomorrow you can have a ray gun or something else. It is not something that you can say by doing this I am going to prevent everything else from happening."
Appellant argues that defendants failed to provide an explanation as plausible as defendants' negligence as the proximate cause of Mr. Ray's death. Dr. Silva, Dr. Newman and Mrs. Landry, nursing supervisor and qualified as an expert in the field of psychiatric nursing, testified that there was no reasonable way to foresee that Mr. Ray would attempt to breathe under water, or that his treatment plan should have been changed in anticipation of such an act. His death was unforeseeable and unpredictable.
It is also the appellant's position that the jury erred in concluding that the hospital was not negligent as a consequence of the actions of the hospital staff on duty when Mr. Ray's body was found in the bathtub. Appellant claims that Mr. Ray should have been removed from the tub more quickly and he could have been revived with proper emergency resuscitation techniques (CPR). The record does not support this contention.
The facts as heard by the jury were uncontroverted. The chart reflects that Mr. Ray was observed at 12:30 a. m. when the late shift came on duty. The male attendant, Lloyd Jackson, saw him several times in the early part of the evening, and Mr. Ray appeared asleep in his bed. Carolyn Commenia, a licensed practical nurse, testified that one of the nurses was making rounds in the early morning hours on Monday (this was about 2:00 or 2:30 a. m.) and discovered that George Ray was not in his bed. Commenia summoned Mrs. Smith, the registered nurse on duty, and together they returned to Mr. Ray's room where they discovered him face down in the bathtub which was full of water. It was apparent to the registered nurse and to the licensed practical nurse that Mr. Ray was dead, based upon the absence of pulse, heartbeat, respiration and no visible signs of life. Lloyd Jackson likewise testified that Mr. Ray's pupils were fixed and dilated and his body temperature lowered. Based upon these observations and the best judgment of the staff on the scene, it was determined that life-saving measures (CPR) would be futile. As an expert, Dr. Newman testified that such efforts to revive Mr. Ray at that point would have been futile.
The appellant further assigns error that the jury failed to conclude that the hospital violated rules adopted by the Louisiana Hospital Licensing Council and promulgated by the State Hospital Board pursuant to LSA-R.S. 40:2109. These regulations *1136 are known as the "Rules, Regulations and Minimum Standards Governing Hospitals and The Hospital Licensing Law." The pertinent regulations pointed out by the appellant are Section 26 of Chapter V, "Patient Care", and Section 70 of Chapter VI, "Specialized Patient Services" which provide:
"§ 26. The hospital shall establish safety policies and procedures for the care of patients who because of their condition are not responsible for their acts."
"§ 70. The layout, design of details, equipment and furnishings of a psychiatric unit shall be such that patients may be under close observation and will not be afforded opportunities for hiding, escape or injury to self or others."
The trial judge properly instructed the jury with regard to the regulations, as follows:
"According to R.S. 40:2109(A) of the Louisiana statutes, the rules and regulations known as the `Rules, Regulations and Minimum Standards Governing Hospitals and the Hospital Licensing Law', shall have the effect of law. These rules and regulations govern the operation and maintenance of hospitals. If you find that the defendants, Ameri-Care Hospital and Carl M. Murphy, did not comply with these regulations, the mere noncompliance with these regulations does not impose fault on these defendants under the circumstances. However, if you find that the violation of these regulations was the cause of Mr. Ray's death, then it is possible for you to find the defendants at fault."
No objection was made to the trial court's charge concerning these regulations. In any event, the charge in the context of this case was correct. Further, the record reflects that the hospital was licensed by the Louisiana Department of Hospitals, operating under the statute above; and the facility was duly accredited by the Joint Commission on Accreditation of Hospitals. Compliance with the statute was a prerequisite to licensing by the state agency.
There was no evidence offered to show that the hospital failed to establish safety policies and procedures for the care of patients unable to be responsible for their own acts; or that the layout, design, equipment, furnishings and construction of the psychiatric facilities did not meet the standards of the regulations for close observation and the prevention of injury, hiding or escape. In fact, the evidence reveals compliance with the regulations. The hospital had established policies for the care of patients who were unable to take care of themselves. The evidence further established that the policies and standards employed by the hospital were similar to other psychiatric units.
Dr. Robert Newman, chief of psychiatric services at Touro Infirmary, testified:
"Q. Okay. Let's talk about that unit as far as the design and layout of that hospital. Does it offend you in any way as against good psychiatric practice or the way to operate a psychiatric facility that patients not otherwise on visual contact would have access to a bathtub?
A. No.
Q. Or a lavatory?
A. No. We are dealing with humans who happen to be sick, and humans who use bathrooms and humans like to take baths, and humans like to present themselves neatly at times and sometimes they like to present themselves otherwise, but they should have the prerogative and the resources to do so if they wish."
We find that the evidence supports the conclusion of the jury that the hospital did not violate the statute or the regulations; or, if there were a violation, that such violation did not cause or contribute to the cause of Ray's death.
Another issue raised by appellant is whether the trial judge properly instructed the jury on the legal principles of the responsibilities of the hospital and the doctor. Appellant claims that the jury was not instructed *1137 that the hospital and doctor should be judged by what they should have known as well as what they knew. The plaintiff also contends that the court's charge concerning the effect or need for expert testimony was improper and objectionable.
On the standard of care applicable to Dr. Silva, the psychiatrist, the trial judge instructed:
"Dr. Silva is a specialist in the field of psychiatry. In a malpractice action based on the negligence of a physician, the plaintiff has the burden of proving by the preponderance of the evidence:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians practicing in the same medical specialty as that in which the defendant physician practices;
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill; and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not have otherwise occurred.
"One who holds himself out as a specialist, and who undertakes service in a special branch of medical or surgical science, owes to his patient the duty of possessing that degree of learning and skill ordinarily possessed by specialists of good standing practicing in the same special field of medicine, under similar circumstances and to use reasonable care and diligence, along with his best judgment, in the application of his skill.
"One of the duties of the physician is to make a diagnosis of the ailments of his patient, and if a physician fails to use the degree of skill ordinarily employed under similar circumstances by the members of his profession in the same medical specialty, in making that diagnosis, then you may conclude that he was negligent in his conduct. But a physician is not obligated, in making a diagnosis, to be correct all the time. It is not malpractice to make a mistake in diagnosis. Making a diagnosis is an act of professional judgment and an incorrect diagnosis is not necessarily an act of negligence. You must consider the physician's conduct in making the diagnosis in comparison to the degree of skill in diagnosis ordinarily employed by other members of the profession in the same medical specialty.
"A physician is not required to exercise the highest degree of skill and care possible. He is not an insurer or guarantor of results, in the absence of an express agreement to that effect. When he undertakes the treatment of a case, he undertakes to use that skill and care ordinarily exercised by physicians in the same field of medical specialty as that in which he practices.
"Further, a physician, upon undertaking a treatment, is under the duty, in the absence of an agreement limiting the service, to continue his treatment after the first treatments, as long as the case requires his attention.
"The standard of care, skill and judgment applicable to a physician in a certain school of medicine are not matters ordinarily within the common knowledge or experience of jurors or lay persons. These standards are within the special knowledge of experts in the field of medicine and can ordinarily only be established by their testimony. Therefore, the care, skill and judgment usually possessed and exercised by physicians in the same school of medicine, under similar circumstances, is to be determined by the testimony of an expert medical witness."
This charge is consistent with the rule to be followed with regard to the defendant psychiatrist, Dr. Silva, in that a medical specialist is required to exercise the degree of care and possess the degree of knowledge and skill ordinarily exercised and possessed by physicians in good standing within his medical specialty under similar circumstances, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the *1138 case. As a psychiatrist, Dr. Silva was subject to the higher standard of care ordinarily practiced by physicians within that particular specialty rather than the standard of care exercised by generalist physicians practicing in the same community. The locality factor is no longer involved in determining the standard of care required of specialists in malpractice suits. Ardoin v. Hartford Accident & Indemnity Company, supra; Bryant v. St. Paul Fire and Marine Insurance Company, 382 So.2d 234 (La.App. 3 Cir. 1980).
We have examined the evidence and find that the record shows that Dr. Silva was not negligent. The evidence does not indicate any deviation from the Ardoin standard of care in his care and treatment of George E. Ray.
The court then charged the jury on the standard of care by which to judge the hospital's conduct, as follows:
"A hospital is bound to exercise the requisite amount of care toward a patient that the patient's condition may require. It is the hospital's duty to protect a patient from dangers that may result from the patient's physical and mental incapacities, as well as from external circumstances peculiarly within the hospital's control. A determination of whether a hospital has breached the duty of care it owes to a particular patient depends upon the circumstances and facts of that case.
"A hospital is not an insurer of a patient's safety, and the rules as to the care required are limited by the rule that no one is required to guard against or take measures to avert that which a reasonable person under the circumstances would not anticipate as likely to happen. The hospital is obligated to use reasonable care in the light of the requirements of the patient's known conditions.
"The hospital, like all other employers in our society, may be held liable for the acts of negligence committed by its employees during the exercise of the functions for which they are employed. A patient is admitted to a hospital under an obligation, owed to him by the hospital and its employees, to provide such reasonable care and attention for his safety as his mental and physical condition, as known to the defendant or its nurses or other employees, may require."
The court then charged:
"In summary, in order to find the defendants' conduct substandard, you must find that as an ordinarily prudent person under all the circumstances surrounding his conduct, the defendants should have reasonably foreseen that as a result of their conduct, some such injury as the plaintiff suffered would occur, and you must find also that they failed to exercise reasonable care to avoid the injury. You may find it helpful to phrase your inquiry this way: `How would an ordinarily prudent person have acted or what precautions would he have taken if faced with similar conditions or circumstances.'"
The rules regarding the duty of a hospital toward its patients are that a hospital is bound to exercise the necessary care toward a patient that his condition requires; the hospital's duty extends to protecting a patient from dangers which may result from the patient's physical and mental incapacities and from external circumstances peculiarly within the hospital's control. Whether a hospital has breached its duty of care owed to a particular patient depends upon the facts and circumstances of the particular case. Richard v. Southwest Louisiana Hospital Association, 383 So.2d 83 (La.App. 3 Cir. 1980), writ denied, 385 So.2d 274 (La.1980); Williams v. Sisters of the Incarnate Word of Galveston, Texas, 341 So.2d 1299 (La.App. 3 Cir. 1977). The standard of care required of a hospital does not require a "community standard" in order to determine if a hospital is negligent under a particular set of circumstances. Richard v. Southwest Louisiana Hospital Association, supra; Bryant v. St. Paul Fire & Marine Insurance Co., supra.
However, the hospital's duty has been traditionally limited: a hospital is not an insurer of a patient's safety, and the rules of care are limited by the rule that no *1139 one is required to guard against or take measures to avert that which a reasonable person under the circumstances would not anticipate as likely to happen. Goodeaux v. Martin Hospital, Inc., 333 So.2d 717 (La. App. 2 Cir. 1976), writ denied, 338 So.2d 295 (La.1976); Guidry v. State, Department of Hospitals, 317 So.2d 222 (La.App. 3 Cir. 1975), writ denied, 320 So.2d 904 (La.1975).
Under the circumstances of the instant case, there was no duty imposed on the hospital to watch or supervise the deceased more closely than was done. Our conclusion is that there was no breach of duty by the hospital in not requiring someone to look out for the safety of Ray on a continuous basis. We are convinced from the evidence that the hospital exercised the care reasonably to be expected in view of this particular patient's condition. Williams v. Sisters of the Incarnate Word of Galveston, Texas, supra; Charouleau v. Charity Hospital of Louisiana at New Orleans, 319 So.2d 464 (La.App. 4 Cir. 1975), writ denied, 323 So.2d 137 (La.1975); Clarke v. Gowen Sanatorium, Inc., 160 So.2d 426 (La.App. 2 Cir. 1964).
Plaintiff's counsel did not object to the general charge in the trial court, so the appellant is precluded from that assignment of error in this Court under LSA-C.C.P. art. 1793; Alexander v. Alton Ochsner Medical Foundation, 276 So.2d 794 (La.App. 4 Cir. 1973), writ denied, 279 So.2d 695 (La.1973).
The charge now objected to was given by the judge as a part of his general comments on witnesses and expert witnesses and was in no way prejudicial to the plaintiff's case. When this charge is viewed in light of the entire charge given to the jury, it is plain that the trial judge did not suggest that only expert evidence could establish the standard of care by which to measure the defendants' conduct. In fact, after an extensive explanation of the meaning of negligence, the court summarized by indicating to the jury that they might find it helpful to ask how an ordinarily prudent person would have acted or what precautions he would have taken if faced with similar circumstances.
The charge given by the judge to which counsel for plaintiff now objects concerning expert testimony is set out above. In connection with this charge on expert evidence, the appellant complains that the failure to give the following requested charge on this question constituted error:
"If you find that George Ray, because of his mental condition, needed special care to protect him, and if you find that the hospital had a duty to provide that care, then you need not rely on expert testimony to determine if that duty was breached. That decision is one that can be made by lay persons such as yourselves by applying an ordinary negligence standard."
The requested charge is not a proper statement of the law, and the giving of the charge was properly refused by the trial judge. Haynes v. Baton Rouge General Hospital, 298 So.2d 149 (La.App. 1 Cir. 1974), writ denied, 302 So.2d 33 (La.1974).
Appellant claims that the jury was not instructed that the hospital and doctor should be judged by what they should have known as well as what they knew; however, Judge Doherty stated to the jury, as quoted supra:
"In summary, in order to find the defendants' conduct substandard, you must find that as an ordinarily prudent person under all the circumstances surrounding his conduct, the defendants should have reasonably foreseen that as a result of their conduct, some such injury as the plaintiff suffered would occur, and you must find also that they failed to exercise reasonable care to avoid the injury."
It is argued that the charge concerning the effect or need for expert testimony was improper, but Judge Doherty stated:
"You should consider each expert opinion received into evidence in this case, and give it such weight as you deem that it deserves. If you should decide that the opinion of an expert witness is not based *1140 upon sufficient education and experience, or if you should conclude that the reasons given in support of the opinion are not sound, or if you feel it is outweighed by other evidence, you may disregard the opinion of that expert entirely."
There is no merit in these contentions.
Further, the requested special charge concerning constructive knowledge of the defendants was adequately covered by the general charge to the jury, and the failure to include the specific verbiage of the special charge requested by the plaintiff did not constitute reversible error. Haynes v. Baton Rouge General Hospital, supra.
We have reviewed the instructions of the trial court in light of the allegations, the issues and evidence presented in the trial of the instant case. We find that these instructions fairly and reasonably point up the issues presented by the pleadings and the evidence and provide correct principles of law for the jury's application to the facts. We hold that the instructions given herein were proper; they did not deprive the plaintiff of a meaningful jury trial and they enabled the jury to reach a verdict which is fully supported by the evidence and the law. Babin v. St. Paul Fire and Marine Insurance Company, 385 So.2d 849 (La.App. 1 Cir. 1980), writ denied, 386 So.2d 358 (La.1980); Hanks v. Drs. Ranson, Swan & Burch, Ltd., 359 So.2d 1089 (La.App. 3 Cir. 1978), writ denied, 360 So.2d 1178 (La. 1978).
A jury verdict should be maintained unless the record reflects that its conclusions of fact are not supported by the evidence, and/or its application of the law is clearly erroneous. Babin v. St. Paul Fire and Marine Insurance Company, supra; Perrin v. St. Paul Fire and Marine Insurance Company, 340 So.2d 421 (La.App. 4 Cir. 1976).
In the absence of manifest error, the appellate court is not to disturb the finding of the jury which has evidence before it furnishing a reasonable factual basis for its verdict, based upon its reasonable evaluation of credibility. Harris v. State Through Huey P. Long Memorial Hospital, 378 So.2d 383 (La.1979); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
In addition, we have carefully reviewed and evaluated the record, and we find no negligence on the part of the defendants. They exercised the required amount of care toward George E. Ray that his particular condition demanded. The factual findings of the jury in determining the issues of liability of the defendants in the case at bar are supported by credible evidence in the record. We have thoroughly reviewed the evidence and under the particular facts and circumstances of this case, we find no manifest error in the jury's findings.
For the assigned reasons, we affirm the judgment appealed at appellant's costs.
AFFIRMED.
NOTES
[1] Prior to trial, The Merit Corporation of Tennessee, which was the lessor of the building in which the medical facility was located, was dismissed as a party defendant.