**Charles Frederick BIGGS Jr.**

v.

**UNITED STATES of America.**

**Civ. A. No. 84–3397.**

United States District Court,
W.D. Louisiana,
Shreveport Division.

March 9, 1987.

Frances Baker Jack, Hunter & Jack, Shreveport, La., for plaintiff.

Joseph S. Cage, U.S. Atty., John R. (Jack) Halliburton, Asst. U.S. Atty., Dept. of Justice, Shreveport, La., for defendant.

MEMORANDUM RULING

STAGG, Chief Judge.

I. INTRODUCTION

On September 11, 1983, Charles Frederick Biggs, Jr., plaintiff's deceased son, entered the Veterans' Administration Medical Center ("VA") in Shreveport, Louisiana for elective surgery to his right shoulder. Biggs was given pre-operative medication and prepared for surgery on the morning of September 15. He was strapped on a

gurney with its side rails in the up position. Biggs was then wheeled to the hallway outside the surgical area and was left there while the operating room was being prepared.

While he was in the hallway, Biggs extricated himself from the restraints, removed the IV needle from his arm, stood up and shoved the IV bag between the movable ceiling tiles, and then jumped or fell from the gurney injuring his right heel. Biggs then crawled down the hallway and into the office of the Director of Surgery where he was found under a secretary's desk screaming about "bombs going off." This suit has been filed under the Federal Tort Claims Act ("FTCA") alleging medical malpractice on the part of the VA in allowing this incident to occur. 28 U.S.C. §§ 2671–2680. Jurisdiction is proper pursuant to 28 U.S.C. § 1346(b).

Under the FTCA, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S.C. § 2674. Louisiana law will be applied in determining liability in this FTCA case. *See* 28 U.S.C. § 1346(b).

## II. APPLICABLE LAW

La.Civ.Code art. 2315 provides that every person who causes damage to another by his fault is obligated to repair the damage. The Louisiana Civil Code further provides that every person is responsible, not only for damages occasioned by his own act, but also for damages caused by the acts of persons for whom he is answerable. La. Civ.Code art. 2317. Under the Louisiana Civil Code, an employer is answerable for the damages occasioned by his employees in the exercise of their duties. La.Civ.Code art. 2320. Louisiana courts apply a duty-risk analysis in assessing liability under these articles of the civil code. *See Dixie Drive It Yourself System v. American Beverage Co.,* 242 La. 471, 137 So.2d 298 (1962)

Louisiana courts also apply this duty risk analysis in cases alleging medical malpractice against hospitals. *See, e.g., Belmon v. St. Frances Cabrini Hospital,* 427 So.2d 541 (La.App. 3d Cir.1983); *Daniel v. St. Francis Cabrini Hospital of Alexandria, Inc.,* 415 So.2d 586 (La.App. 3d Cir.1982); *see also Sibley v. Board of Supervisors of Louisiana State University,* 477 So.2d 1094, 1099 (La.1985). Under this duty-risk analysis, the plaintiff must demonstrate: (1) that the hospital's actions were a cause-in-fact of injury; (2) that the hospital owed him a duty which was imposed to protect against the risk involved; (3) that the hospital breached that duty; and (4) that he suffered an injury.

The cause-in-fact determination is straightforward and simple. In order for the defendant's conduct to be a cause-in-fact of a plaintiff's harm, it must be shown to be a substantial factor in causing the injury. *See Belmon,* 427 So.2d at 543. In the present case, this factor is clearly met. But for the hospital's failure to prevent him from jumping from the stretcher, Biggs would not have injured his heel.

A hospital's duty to its patients has been described in numerous cases in the Louisiana jurisprudence. The leading Supreme Court case is *Hunt v. Bogalusa Community Medical Center,* 303 So.2d 745 (La.1974). The *Hunt* court stated:

A hospital is bound to exercise the requisite amount of care toward a patient that the particular patient's condition may require. It is the hospital's duty to protect a patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control.

303 So.2d at 747. *See also Ray v. Ameri-Care Hospital,* 400 So.2d 1127, 1138 (La. App. 1st Cir.1981). "A hospital has a duty to provide and maintain adequate facilities and supplies and a competent staff so as to provide competent care to its patients." *Sibley v. Board of Supervisors of Louisiana State University,* 490 So.2d 307, 311 (La.App. 1st Cir.1986). Louisiana jurisprudence also holds "that a hospital is responsible for the negligence of its employees including, inter alia, nurses and attendants, under the doctrine of respondeat superior." *Daniel,* 415 So.2d at 589; *see also Sibley,*

477 So.2d at 1099; *Belmon,* 427 So.2d at 544. The guidelines of the Joint Committee on Accreditation of Hospitals serve as evidence of the medical profession's accepted standard of care. *Sibley,* 490 So.2d at 311–12.

The determination of whether the hospital has breached its duty of care "depends upon the facts and circumstances of the particular case." *Ray,* 400 So.2d at 1138; *Hunt,* 303 So.2d at 747; *Daniel,* 415 So.2d at 589; *see also Bossier v. DeSoto General Hospital,* 442 So.2d 485, 488 (La.App. 2d Cir.1983). However, a hospital is not an insurer of the patient's safety. *Ray,* 400 So.2d at 1138; *Smith v. Doe,* 483 So.2d 647, 650 (La.App. 4th Cir.1986). Nor is a hospital responsible for guarding against occurrences that a reasonable person would not anticipate. *Ray,* 400 So.2d at 1138–39; *Smith,* 483 So.2d at 650.

■ Plaintiff attempted to show a breach of duty by the VA on three theories:

1. That the VA nurses gave Biggs two injections of pre-operative medications, instead of the single injection ordered by the doctor;

2. That the hospital should have known that the pre-operative medications would cause a psychotic episode; and

3. That the VA failed to monitor Biggs at all times while he was in the hallway and failed to provide sufficient nursing personnel so as to recognize promptly a change in his condition.

However, this court finds from all of the testimony surrounding the events of September 11, 1983 that: (1) Biggs was administered only *one* set of pre-operative medications, (2) that the medication did not cause a psychotic episode, (3) that his psychotic episode was not a foreseeable event, and (4) the conduct of the VA did not fall below the standard of care for patient monitoring or sufficient staffing.

## III. PRE–OPERATIVE MEDICATION

Plaintiff's assertion that Biggs received a double dose of his pre-operative medications arises from the fact that the medications are noted twice on his "PRN and One Time Medication Record." (Plaintiff Exhibit 2; Government Exhibit 3 (9/11–28/83) at 28) On this chart, Susan Lott noted that she administered the pre-operative medication at 10:45 on September 15, 1983. Immediately following Lott's notation, there is a second notation by Carolyn Flynn indicating that she also administered the pre-operative medications at 11:00 A.M. on the same day. Despite the fact that two notations appear on the "One Time Medication Record," the evidence in this case shows beyond a reasonable doubt that Biggs was given only one set of pre-operative medications in accordance with doctor's orders.

Susan Lott and Carolyn Flynn were both student nurses training on Ward 4–E of the VA Hospital during Biggs' admission. Biggs was Susan Lott's patient. Lott had administered pre-operative injections before. Carolyn Flynn, however, had no experience in administering pre-operative injections, and the nursing supervisor suggested that Flynn administer Biggs' injection. Flynn testified that together she and Susan Lott prepared the medications for Mr. Biggs but that only she administered them. The two notations were explained as follows: Susan Lott made one notation because Biggs was her patient; Carolyn Flynn made another notation because she actually gave the shot. Although they both made notations on the "One Time Medication Record," Lott and Flynn stated that only one medication set was given. This particular incident was remembered by Carolyn Flynn because it was her first pre-operative injection and it was the only one she gave at the VA.

The testimony of the two nurses is corroborated by documents in the record. First, the nurses' progress notes written by Susan Lott specifically state that Biggs was given his pre-operative injection by Carolyn Flynn. (Government Exhibit 3 (9/11–28/1983) at 10). Thus, the double notation of the pre-operative injection is explained by contemporaneous records made at the time of the injection. Second, the "Controlled Substance Administration Record" for the drug Demerol on Ward

4–E shows that only one dose was taken out for Mr. Biggs. Demerol was the only controlled substance included among the pre-operative medications administered to Biggs. All controlled substances which are administered to patients at the VA must be taken out of a locked cabinet and accounted for. A running balance of the number of units of the drug remaining in the cabinet is maintained on a log. This log conclusively demonstrates that only one unit of Demerol was signed out for Biggs. The "Controlled Substance Administration Record" was explained by Mr. Charles Bourgeois, a pharmacist at the VA. He reviewed the sheet and testified that there were no discrepancies for Demerol on Ward 4–E during the relevant time period and that his review of this record indicates that only one unit was signed out for Biggs.

Finally, uncontroverted medical testimony reveals that even if Biggs had been administered a double dose of his pre-operative medications, the total dosage would still be well within the acceptable limits for pre-operative use. Dr. John T. Wilson testified that he reached this conclusion after an exhaustive search of the literature for accepted clinical doses of the drugs administered. Plaintiff offered no testimony which contradicted Dr. Wilson's conclusions. There was simply no breach of the expected level of care in the administration of Mr. Biggs' pre-operative medication.

## IV. MEDICATION AND PSYCHOTIC REACTION

The best explanation offered by physicians called by both plaintiff and defendant for what occurred when Biggs pulled himself out of his restraining straps, stuck his IV bag in the ceiling, and jumped from the stretcher, is that Biggs suffered an acute psychotic episode. Plaintiff contends that the VA should have known that such a psychotic episode was possible given the drugs administered and his history of alcohol and drug abuse. The evidence in this case simply does not support this theory.

The pre-operative workup for Biggs was within the normal range. (Deposition of Dr. Salem F. Sayegh at 9–10; deposition of Dr. Mack A. Thomas at 10). On September 15, 1983, Biggs was given routine pre-operative medications: 75mg of Demerol, 50mg of Vistaril and .3mg of Atropine. According to Dr. Sayegh, "[t]he first two medications are for sedation. The Atropine is for drying the secretions in the tracheobronchial tree, in the lung and in the bronchus." (Deposition at 10). Dr. John William King described the effects of Demerol and Visteril in greater detail:

> Demerol is a narcotic analgesic which is used preoperatively to both delay anxiety in patients and also to relieve any discomfort that they might have during initiation of IV therapy, or in patients that have to have a spinal tap or any other needle sticks or other invasive procedures, prior to the admission of general anesthesia. It delays pain and anxiety. The Visteril is a drug which is used preoperatively for a number of reasons. One is, it's a true tranquilizer, it relaxes the patient, it reduces anxiety about the coming surgery. Another benefit of Visteril is that it does this without any cortical depressant effects—that is, it doesn't make one sleep or confused or drowsy. It is not a CNS depressant, a central nervous system depressant, it works in a different way. It also has the beneficial effect of working as an antiemetic, that is a drug that reduces the sense of nausea and a desire to vomit. These side effects can occur in some patients that receive Demerol, so Visteril also reduces the bad side effects of Demerol. And another point is that because they act together to reduce anxiety, you can use less of each of the drug and therefore reduce their individual toxicity by combining them. Visteril also has the property that it is an excellent anti-psychotic drug. It is used to treat patients with acutely—acute hysteria, patients with acute and chronic alcohol withdrawal symptoms, and in particular it is the drug that is used to treat delirium tremens, and that information can be found in the PDR, Physicians Desk Reference.

(Deposition at 11–12)

Dr. Wilson, the expert pharmacologist, testified that it was improbable that the

pre-operative medication was the source, or cause, of Biggs' psychotic episode. Dr. Wilson came to this opinion after an extensive review of Biggs' medical records. He found no heightened individual susceptibility to the three drugs after reviewing past incidences in which those drugs were administered to Biggs. Dr. Wilson stated that he was unable to establish a pattern between the use of these drugs and erratic behavior in Mr. Biggs. Further, Dr. Wilson found nothing in the medical literature which indicates that any of the drugs, or all three of them together, are contraindicated in patients with a history of alcohol abuse. Dr. Thomas, an expert in anesthesiology, Dr. Sayegh, an expert in surgery, and Dr. King, an expert in internal medicine, all agreed with Dr. Wilson's conclusion that the pre-operative medications were not the cause of Biggs' psychotic episode. Dr. King testified in his deposition:

> Visteril, one of the drugs that he was given, is specifically an anti-psychotic drug, used to treat what he manifested eventually. Demerol and Visteril would both reduce the seizure threshold, or perhaps a better term for that would be reduce the threshold for an acute psychotic episode if they were due to alcohol withdrawal. Regardless of what they are due to, I can't think of any reason why any of the three drugs, Atropine being the other one, which is used to dry up secretions, would in any way stimulate the central nervous system and precipitate an acute psychotic reaction of any sort. There actually—he was given an anti-psychotic dose of Visteril.

(Deposition at 13–14). Plaintiff simply has not proven that Biggs' psychotic episode was tied to his pre-operative medications, nor has it been shown that the psychotic reaction was foreseeable from a pharmacological standpoint. Under Louisiana law, no hospital is responsible for guarding against occurrences that a reasonable person would not anticipate. *See Ray*, 400 So.2d at 1138–39; *Smith*, 483 So.2d at 650.

## V. SUFFICIENT STAFFING

■ Plaintiff's final theory of recovery is that the VA should have provided better

supervision for Biggs while he was in the hallway of the operating suite awaiting surgery. There was a conflict of expert testimony on this point. Dr. George Wallace testifying for plaintiff stated that Biggs should have been supervised by an attendant while he was waiting to be transported into the operating room. On the other hand, Drs. King and Thomas, testifying for the defense, stated that it was within the accepted standard of care to leave pre-operative patients in the hallway without constant supervision. While there is a conflict in the medical testimony, the legal standard is clear that a hospital must protect a patient from any dangers resulting from the patient's physical and mental incapacities. A hospital must also provide a competent staff for patient care. The determination of whether a hospital has breached the duty of care owed to its patients must be made based on the totality of circumstances involved in the case.

In this case Biggs reported to the hospital with a smell of alcohol on his breath. Each of the three treating physicians testified that he was aware of Biggs' history of alcohol abuse. (Deposition of Dr. Douglas N. Liles at 10; deposition of Dr. Gregory J. Smolarz at 10; deposition of Dr. David L. Gerstner at 8). These doctors specifically observed Biggs, beginning on September 11, for signs of alcohol withdrawal. *Id.* They found none. Dr. King testified that delirium tremens "is a severe form of alcohol withdrawal that usually manifests itself anywhere from forty-eight to one-hundred twenty hours, two to five days after a cessation of alcohol consumption." (Deposition at 8). Dr. King described the physical and psychological symptoms of alcohol withdrawal as follows:

> The results of this psychotic episode which will occur and will be accompanied by hallucinations, anxiety, sometimes rage, also a set of physical findings such as fast heart rate, high blood pressure, rapid breathing. The sudden withdrawal of alcohol on these patients lead to both hyperactivity of the higher cortical centers of the brain and also the lower centers of the brain, so they manifest both

an acute psychosis and hallucinate, and also have a number of physical findings which I mentioned.

*Id.*

The morning of his surgery, Biggs became nervous. Dr. Liles, the chief orthopedic resident in charge of Biggs' case then visited him. Dr. Liles testified that he "walked up to the ward and directly interviewed the patient. He was nervous. He appeared anxious. He appeared somewhat tremulous." (Deposition at 13). Dr. Liles specifically observed Biggs for signs of alcohol withdrawal and found nothing: "I spoke to him. He answered all my questions appropriately. He said he was scared. I tried to counsel him and console him. He wished to continue with his operation. He was not seeing or hearing voices or seeing bugs crawling on the wall or anything like that. I specifically asked about that because I was definitely aware that the man had an alcohol problem and delirium tremens are something that you're concerned about." *Id.* at 13–14. This bedside visit by his attending surgeon took place immediately before Biggs was taken to the operating suite.

After his pre-operative medications were administered, Leroy Rhodes, a nursing assistant at the VA with fifteen years experience, went to Ward 4–E to transport Biggs to the operating suite. According to Rhodes, Biggs looked "normal" at the time. Biggs was placed on the stretcher and a security strap similar to a seatbelt was fastened around his thighs. Both of the side rails were raised and locked. Additional restraints such as the chest strap or posey straps on the arms were not used. Rhodes wheeled Biggs down to the operating suite without incident. Inside the operating suite, Biggs was placed in the hallway in between the doors to the nurses' workroom and the prep room. Before Rhodes left Biggs there, he asked him if he was comfortable or needed a blanket because the operating suite is much colder than the wards. Rhodes reported that Biggs stated that he was all right. Not any single person is responsible for a patient waiting in the hallway for surgery. Rather, the patient is the responsibility of all hospital staff working in the operating area.

Several people, including Violet Taylor, a circulating nurse, and William Giles, a housekeeper, saw Biggs while he was in the hallway. However, unseen by anyone, Biggs slipped out of his restraining strap, stood up on the gurney and put the IV in the ceiling, and then jumped down from the stretcher, apparently making a loud noise. John Sumner, another nursing assistant assigned to the operating suite, was in a room down the hall from where Biggs' stretcher was located. He heard the noise and immediately went to the door of the room to see what had happened. Sumner saw Biggs on all fours crawling quickly down the hall. He saw him pass through the two automatic doors at the end of the hallway. Sumner testified that Biggs was crawling down the center of the hall and that the doors were already open when Biggs passed through. These doors are operated by either a foot or hand pedal which activates the doors and opens them. They remain open for approximately thirty-five seconds after the pedal has been pushed. Sumner did not believe that Biggs had the time to push the pedal himself.

Sumner testified that he had to run in order to catch up to the crawling Biggs. Biggs was apparently screaming by this time because Louise Tuminello, secretary to the director of surgery, heard the noise and got up from her desk to see what was happening. As she reached the door of her office, Biggs crawled in and went under her desk. Biggs was apparently yelling about bombs—either bombs being upstairs or a bomb being in his chest. Tuminello testified that Sumner came into her office immediately after Biggs. Sumner was followed by nurses who attempted to calm Biggs down. Biggs was placed on a stretcher and taken to the recovery room. Several people testified that when they passed the stretcher on which Biggs had been lying, the side rails were still up and the strap was still fastened. Dr. Liles was notified of this incident, and he obtained an emergency psychiatric consultation.

Dr. Jose Bisquerra, a psychiatrist, saw Biggs in the recovery room. His diagnosis was that Biggs had suffered an acute psychotic episode. Biggs told Dr. Bisquerra that he had ingested alcohol and drugs the night before the surgery although Biggs would not give any details when asked about this. Dr. Bisquerra prescribed Valium, B-complex vitamins and thiomine to prevent spasms or another toxic reaction. Biggs' injury to his right heel was treated in the recovery room and he was returned to his ward at approximately 2:30 in the afternoon of the same day.

■ Plaintiff's counsel made repetitive allusions to thirteen alleged prior episodes of unusual behavior during hospital admissions including two episodes involving interference with medical equipment. However, the record in this case is for the most part barren of any evidence concerning these prior episodes. Dr. Wilson, a pharmacologist, reviewed Biggs' prior admissions to determine whether or not Biggs had any sensitivity to any of the three drugs administered to him on the morning of September 15, 1983. The chart of Biggs' hospital admissions reveals numerous hospitalizations for heart disease and alcoholism. Some of these so-called episodes of unusual behavior in the hospital include comments that Biggs was "very depressed", was "depressed and uptight", or "very apprehensive", and a comment that Biggs was an "unstable individual." There is *no evidence* in this lawsuit that the hospital should have been put on notice that Biggs was likely to suffer a psychotic episode. The two alleged incidences of interference with medical equipment consist of an incident in October of *1977* when Biggs took the IV tubing out of the bag to see how it worked and another incident in July, *1978* when Biggs refused to stay in bed and disconnected his heart monitor. As best as this court can determine from the secondhand analysis contained in Dr. Wilson's pharmacological report, this is at most the history of an uncooperative patient. There is no proof that this is a history of a disturbed or psychotic individual. This court is unwilling, and unable, to rule on the basis of Dr. Wilson's synopsis

alone that these prior incidences should have put the VA on notice of potential psychotic behavior in Biggs on the day of his scheduled surgery. The plaintiff has simply failed to carry the burdens of production and persuasion on this point.

Further, there is nothing in the record which should have put the VA on notice of a probable psychotic attack on the morning of his surgery. There was expert psychiatric testimony from Dr. Bisquerra that such episodes are not generally predictable. He was seen by the treating physician that morning and nothing unusual was noted despite the fact that the doctor was specifically looking for symptoms of possible alcohol withdrawal. Biggs was seen by an experienced nursing assistant on his way to the surgery suite, and nothing unusual was noted then. He was seen in the hallway by several people and nothing unusual was noted by them. All people making these observations were from the staff of the VA Hospital. Dr. King testified to the tragic fact that the staff of the VA Hospitals are acutely aware of alcoholism and its related problems: "All patients of the VA are watched carefully ... and the reason is the VA population is notorious all around the country ... for having a very, very high frequency of their patients being alcohol abusers.... How frequent that is and seriously that is taken is that alcoholism is a major problem, probably between alcoholism and cigarette smoking, the two major health problems that our veterans face, so they are always on everybody's mind. That's not necessarily true of other hospitals, but the VA system, alcoholism is so common that it is something that is always a concern." (Deposition at 27–28). No one on this experienced staff noticed anything unusual about Biggs.

Indeed, the staff demonstrated an amazingly quick response when Biggs did act out of the ordinary. This court believes John Sumner's testimony that the doors at the end of the hallway were already open when Biggs passed through them. This means that someone had just walked through these doors and had activated the control pedals. Sumner was immediately

on the scene followed by several nurses. This court concludes that the VA fulfilled its duty to provide "prompt recognition of an untoward change in a patient's condition and to facilitate appropriate intervention by the nursing, medical, or hospital staffs." See Accreditation Manual for Hospitals at 117–118 (1983) (Plaintiff's Exhibit 4).

Further, this court cannot find to a reasonable probability that had someone been observing Biggs at all times, that something could have been done. When Dr. King was asked if someone observing Mr. Biggs could have stopped him from removing his IV and jumping from the gurney, he replied

> They may have become injured in doing that. This man was acting psychotic and by what I can glean from the chart, I think that there may have been several injuries with someone around an IV pole and running down the hall.... If you would put yourself in the position of a nurse and a man swinging around, having hallucinations, yelling, bomb, with a metal pole in his hand, you might naturally step back. I have seen people injured by patients, seriously injured by patients, physicians and nurses.... I think [that] what could have been done, if they had seen that happen, somebody in acute psychotic state in which they may injure someone—there are two problems there, the VA has a rule which states that regardless of a situation a VA employee must never injure a veteran * * * you can't just go wrestle them to the ground, you've signed a statement that you will not assault a VA patient, and you can't just walk up to someone who is psychotic and acting aggressively and necessarily go up there and stop them, you may be able to, but I think the proper thing to do would be to call the police and get them up there to control the patient with whatever is necessary to control the patient.

(Deposition at 30–32). Even though Leroy Rhodes stated that he could have stopped Biggs, this court is not convinced that this very conscientious employee would have been enough to stop him given that Biggs hurled himself to the ground with enough force to cause an avulsion fracture of his right heel.

In sum, this court concludes that there was no breach of the standard of care expected of the hospital in this unfortunate incident involving Charles Frederick Biggs, Jr. Louisiana jurisprudence supports this conclusion. In the numerous cases involving patient injuries, two factors seem to be of utmost importance: response time and predictability. When hospitals or their staffs take an inordinate amount of time to respond to patient needs for assistance, liability is likely to be found against the hospital. *Compare Smith v. Doe,* 483 So.2d 647 (La.App. 4th Cir.1986) (four bedpans were not replaced overnight and no response was made to the patient's call for assistance; hospital liable when patient fell) *and Daniel v. St. Francis Cabrini Hospital of Alexandria, Inc.,* 415 So.2d 586 (La.App. 3d Cir.1982) (patient with organic brain syndrome and taking tranquilizers was left alone in bathroom for five to ten minutes after enema was given; hospital liable when patient fell) *and Leavitt v. St. Tammany Parish Hospital,* 396 So.2d 406 (La.App. 1st Cir.1981) (heavily sedated and disoriented patient waited over fifteen minutes for assistance; hospital liable when patient fell) *with Mullins v. Our Lady of the Lake Hospital, Inc.,* 402 So.2d 170 (La.App. 1st Cir.1981) (patient's drugs would not significantly impair senses, no call was made to the nurse's station and side rails were up on the bed; hospital was not liable when patient fell). Similarly, liability will be found when the hospital staff fails to take precautions against a known predictable risk, but not when the patient risk is unforeseeable. *Compare Belmon v. St. Frances Cabrini Hospital,* 427 So.2d 541 (La.App. 3d Cir.1983) (patient given anticoagulant drugs; yet no precautions were taken when blood was drawn for routine tests; hospital liable for complications due to excessive bleeding; *with Ray v. Ameri-Care Hospital,* 400 So.2d 1127 (La. App. 1st Cir.1981) (patient found drowned after conducting an experiment based on delusion that he could breathe under water; hospital not liable) *and Caldwell v. United*

*States,* 548 F.Supp. 91 (E.D.La.1982) (disoriented patient gave no warning of suicidal tendencies; hospital was not liable when patient jumped from fourth floor seclusion room). In this case, the VA did not take an inordinate amount of time to respond once Biggs had exhibited his psychotic symptoms. Further, that psychotic episode was not predictable. The present case is most similar to the *Ray* and *Caldwell* cases, *supra.* Like the behavior of the patients in those cases, the psychotic behavior exhibited by Biggs was simply not predictable. Under Louisiana law, "no one is required to guard against or take measures to avert that which a reasonable person, under the circumstances would not anticipate as likely to happen." *Sabella v. Baton Rouge General Hospital,* 408 So.2d 382, 384 (La. App. 1st Cir.1981).

Accordingly, it is ordered that there be judgment in favor of the defendant and that plaintiff take nothing. A judgment consistent with the terms of this memorandum ruling shall issue herewith.